UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICHARD P. TAYLOR,
     Plaintiff,


          v.                              CIVIL ACTION NO.
                                          19-11947-MBB


ERIK V. GRUNIGEN,
     Defendant.

**MEMORANDUM AND ORDER RE:**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 115);**
**PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 120)**

**April 26, 2022**

**BOWLER, U.S.M.J.**

     Pending before this court are two motions for summary

judgment.  The first, filed by defendant Erik V. Grunigen

("defendant" or "Grunigen") (Docket Entry # 115), is opposed by

plaintiff Richard P. Taylor ("plaintiff" or "Taylor") (Docket

Entry # 194-2).  The second, filed by plaintiff (Docket Entry #

120), is opposed by defendant (Docket Entry # 135).

<u>PROCEDURAL BACKGROUND</u>

     Plaintiff initiated this action on September 13, 2019.

(Docket Entry # 1).  The amended complaint[1] brings eight causes of

────────────────────

[1] As noted in this court's memorandum and order dated April 26,
2022, the governing complaint in this action is the proposed
amended complaint (with exhibits) that plaintiff filed on March
30, 2020 (Docket Entry ## 20-1 to 20-49) (the "amended
complaint").  (Docket Entry # 207, p. 2, n. 2).

action: violation of section 17704.10(c) of California's Revised Uniform Limited Liability Company Act ("RULLCA") (Count I); breach of the "1210 Fire Rock LLC Operating Agreement" (Count II); violation of section 17701.13(d)(7) of RULLCA (Count III); violation of section 17704.09 of RULLCA (Count IV); violation of section 16404 of California's Revised Uniform Partnership Act ("RUPA") (Count V); fraud in violation of California common law (Count VI); conversion in violation of California common law (Count VII); and fraudulent conveyance in violation of the California Civil Code (Count VIII). (Docket Entry # 20-1, ¶¶ 156-210). Plaintiff voluntarily dismissed Count VIII. (Docket Entry # 86). Defendant filed an amended answer and alleged two counterclaims for breach of contract and setoff, both arising under California common law. (Docket Entry # 29).

On April 25, 2022, this court issued a memorandum and order dismissing counts IV and VII of the amended complaint. (Docket Entry # 207). Accordingly, in adjudicating the parties' motions for summary judgment (Docket Entry ## 115, 120), this court addresses only the remaining counts of the amended complaint (counts I, II, III, V, and VI) and defendant's two counterclaims.

<u>STANDARD OF REVIEW</u>

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine

whether trial is actually required.'"  Tobin v. Federal Express Corp., 775 F.3d 448, 450 (1st Cir. 2014) (quoting Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992)).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  It is inappropriate, in contrast, "if the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side."  Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir. 2014).

In adjudicating a motion for summary judgment, "the court must examine the 'record in the light most favorable to the nonmovant' and must make 'all reasonable inferences in that party's favor.'"[2]  Garcia-Garcia v. Costco Wholesale Corp., 878 F.3d 411, 417 (1st Cir. 2017) (quoting Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 68 (1st Cir. 2015)).  However, "facts must be viewed in the light most favorable to the

---

[2] Where, as here, the parties have each filed a motion for summary judgment, the court must "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 170 (1st Cir. 2004).  Each motion for summary judgment is therefore reviewed separately and factual disputes are resolved in favor of the nonmoving party.  See OneBeacon America Ins. Co. v. Commercial Union Assurance Co. of Canada, 684 F.3d 237, 241 (1st Cir. 2012) (viewing cross motions for summary judgment "'separately,' in the light most favorable to the non-moving party, and draw[ing] all reasonable inferences in that party's favor").

nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). As such, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id.

"An issue is 'genuine' when a rational factfinder could resolve it [in] either direction," and a "fact is 'material' when its (non)existence could change a case's outcome." Mu v. Omni Hotels Mgmt. Corp., 882 F.3d 1, 5 (1st Cir. 2018); see Scott, 550 U.S. at 380 ("'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" (citation omitted)). "To succeed in showing that there is no genuine dispute of material fact, the moving party must direct [the court] to specific evidence in the record that would be admissible at trial."[3] Ocasio-Hernandez v. Fortuno-Burset, 777 F.3d 1, 4-5 (1st Cir. 2015). "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already

---

[3] However, a court may examine all of the record materials on file even when not cited by the parties. Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014); Fed. R. Civ. P. 56(c)(3).

on file . . . demonstrate that the non-moving party will be
unable to carry its burden of persuasion at trial.'"[4]  Ocasio-
Hernandez, 777 F.3d at 4-5 (quoting Carmona v. Toledo, 215 F.3d
124, 132 (1st Cir. 2000)).  "[C]onclusory allegations,
improbable inferences, and unsupported speculation" are ignored.
Garcia-Garcia, 878 F.3d at 417 (citation and internal quotation
marks omitted).  "[I]f the summary judgment record
satisfactorily demonstrates that the plaintiff's case is, and
may be expected to remain, deficient in vital evidentiary
support, this may suffice to show that the movant has met its
initial burden."  Carmona, 215 F.3d at 133.  Once the moving
party has "demonstrate[d] the absence of any genuine issue of
material fact," "the burden shifts to the nonmoving party, who
must, with respect to each issue on which [he or] she would bear
the burden of proof at trial, demonstrate that a trier of fact
could reasonably resolve that issue in [his or] her favor."
Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st
Cir. 2010).

---

[4] "[A]ffidavits and deposition testimony are effective in
[supporting or] opposing summary judgment only when they are given
on personal knowledge, set out facts that would be admissible in
evidence, and show that the affiant or deponent (as the case may
be) is competent to testify about the matter in question."  Hannon
v. Beard, 645 F.3d 45, 49 (1st Cir. 2011); see also Fed. R. Civ.
P. 56 ("An affidavit or declaration used to support or oppose a
motion must be made on personal knowledge, set out facts that
would be admissible in evidence, and show that the affiant or
declarant is competent to testify on the matters stated.").

"Where . . . a defendant moves for summary judgment on the basis of an affirmative defense – like the statute of limitations – the defendant bears the burden of proof and 'cannot attain summary judgment unless the evidence that he provides on that issue is conclusive.'" Ouellette v. Beaupre, 977 F.3d 127, 135 (1st Cir. 2020) (quoting Torres Vargas v. Santiago Cummings, 149 F.3d 29, 35 (1st Cir. 1998)).  "If the defendant produces such conclusive evidence, 'the burden shifts to the plaintiff to establish that the statute of limitations does not apply.'"  Ouellette, 977 F.3d at 135 (citation omitted).  "If the application of the statute of limitations 'turn[s] on disputed issues of fact, those facts must be resolved by a jury.'"  Schneider v. BMW of N. Am., LLC, No. 18-CV-12239-IT, 2019 WL 4771567, at *7 (D. Mass. Sept. 27, 2019) (quoting Nat'l Ass'n of Gov't Emps. v. Mulligan, 854 F. Supp. 2d 126, 131 (D. Mass. 2012) (citation and internal quotation marks omitted)).

Uncontroverted statements of fact in a L.R. 56.1 statement of material facts comprise part of the summary judgment record.  See L.R. 56.1; Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (admitting a date on summary judgment because plaintiff failed to contest date in L.R. 56.1 statement); Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102 (1st Cir. 2003) (admitting undisputed material facts that plaintiff

failed to controvert).  Defendant filed a L.R. 56.1 statement of
material facts (Docket Entry # 117-1), to which plaintiff filed
a response (Docket Entry # 194-1, pp. 1-14) and a statement of
additional facts (Docket Entry # 194-1, pp. 15-75).  Plaintiff
also filed, in support of his own motion, a L.R. 56.1 statement
of material facts (Docket Entry # 120-1), to which defendant
filed a response (Docket Entry # 136, pp. 1-13) and two
additional facts (Docket Entry # 136, pp. 13-14).

I.   Defendant's Motion for
     Summary Judgment (Docket Entry # 115)

                    FACTUAL BACKGROUND[5]

     From 1998 through 2017, Taylor and Grunigen (collectively,
"the parties") "engaged together in a series of real estate
development projects."  (Docket Entry # 117-1, p. 1, ¶ 1)
(Docket Entry # 194-1, p. 1, ¶ 1).  The parties' "projects were
constructed pursuant to partnership arrangements" that were
"typically verbal."  (Docket Entry # 117-1, p. 1, ¶ 2) (Docket
Entry # 194-1, p. 2, ¶ 2); see also (Docket Entry # 194-1, p. 2,

---

[5]  As noted previously, plaintiff filed not only a response to
defendant's statement of material facts but also a 61-page
statement of additional facts.  See (Docket Entry # 194-1, pp.
1-14) (plaintiff's response to defendant's statement of facts);
(Docket Entry # 194-1, pp. 15-75) (plaintiff's statement of
additional facts).  In adjudicating defendant's motion for
summary judgment, this court reviewed the entire summary
judgment record, excluding statements inappropriate for
consideration on summary judgment (e.g., conclusory and
immaterial allegations).

¶ 8) (Docket Entry # 194-3, p. 2, ¶ 7).

"In or about 2013 and ending in 2017, the parties developed two luxury residences . . . in a gated community located on Fire Rock Loop in Templeton, California . . . ." (Docket Entry # 117-1, p. 2, ¶ 4) (Docket Entry # 194-1, p. 2, ¶ 4). The parties developed the first residential project, known as "1610 Fire Rock Loop" ("1610 Fire Rock Loop" or "1610 Fire Rock Loop project"), pursuant to an unwritten partnership agreement (the "1610 Fire Rock Loop partnership"). (Docket Entry # 117-1, p. 2, ¶¶ 5-7) (Docket Entry # 194-1, p. 2, ¶¶ 5-7). The parties agreed "to contribute their respective services and to 'split expenses and profits equally.'" (Docket Entry # 117-1, p. 2, ¶ 7) (Docket Entry # 194-1, p. 2, ¶ 7) (citation omitted). "During the acquisition and pre-development phase for 1610 [Fire Rock Loop], [Taylor] took the lead in acquisition, project due diligence, financial modeling, market and feasibility analysis, [and] assembling a team of construction professionals" and, "with the support of Grunigen and Chad Logan ('Logan'), who Grunigen had hired as [g]eneral [c]ontractor, prepar[ed] a project budget." (Docket Entry # 194-3, p. 5, ¶ 23); see (Docket Entry # 119-1, p. 2, ¶ 3). At his deposition on

September 17, 2020 (Docket Entry # 118-5),[6] Taylor testified that
he "handled most of the paperwork" (Docket Entry # 118-5, p. 63)
(Docket Entry # 194-1, p. 3, ¶ 12) (Docket Entry # 194-1, p. 3,
¶ 12) and the "conceptual design" of the house at 1610 Fire Rock
Loop (Docket Entry # 118-5, p. 63); see (Docket Entry # 194-3,
p. 5, ¶ 23).  Grunigen, in turn, "prepared the construction and
permit drawings" and "either he or Logan calculated the
quantities of materials needed for the house."  (Docket Entry #
194-3, p. 5, ¶ 23).  "Taylor deferred to Grunigen on matters
pertaining to his role, duties and obligations as the owner [and
seller] of the of the 1610 [Fire Rock Loop] lot, . . . as the
warrantor of the new home and in his role as the [a]rchitect of
[r]ecord who had prepared the construction plans and takeoffs."
(Docket Entry # 194-3, p. 7, ¶ 29); see (Docket Entry # 118-5,
p. 65) (Docket Entry # 194-1, p. 3, ¶ 11).

For the second project, which began in 2014 or 2015 and was
known as "1210 Fire Rock Loop" ("1210 Fire Rock Loop" or the
"1210 Fire Rock Loop project"), the parties also agreed to be
partners and split profits equally (the "1210 Fire Rock Loop
partnership").  (Docket Entry # 117-1, p. 2, ¶¶ 17-19) (Docket
Entry # 194-1, p. 5, ¶¶ 17-19) (Docket Entry # 194-3, p. 18, ¶¶

---

[6] Docket Entry # 118-5 is a transcript of Taylor's deposition
testimony.  See (Docket Entry # 118-5).  This court cites to the
transcript using its internal page numbers.

75-77); see (Docket Entry # 118-5, p. 109).  The parties
additionally agreed that Taylor would take "the lead" in
"procuring financing, . . . financial modeling, [and]
acquisition," and Grunigen would take "the lead" in "permitting"
and "conceptual design."  (Docket Entry # 194-3, p. 18, ¶ 76);
see (Docket Entry # 118-5, p. 110) (Taylor's deposition
testimony that, for 1210 Fire Rock Loop: he "processed the
bills"; Grunigen "more so did the design of the house" and, with
Logan, "handled the permitting"; and the parties "jointly . . .
determined . . the design theme, modifications, [and] speccing"
and "oversaw Shane [Derrick]"[7]).

For both the 1210 Fire Loop partnership and 1610 Fire Rock
Loop partnership (together, the "partnerships"), the parties
"were jointly responsible for the management, operation,
obligations, and duties of the [p]artnership[s] and agreed to
each be responsible for fifty percent of the costs, expenses,
liabilities, management, operations, obligations, and duties of
the [p]artnerships' business."  (Docket Entry # 194-3, p. 5, ¶
22).  To fund the 1210 Fire Rock Loop project and 1610 Fire Rock
Loop project (together, the "projects"), "Grunigen and [Taylor],
as individuals, borrowed funds from the Oakmont Fund, LLC

---

[7] Grunigen hired Shane Derrick ("Derrick") as one of the general
contractors for the 1610 Fire Rock Loop project and/or 1210 Fire
Rock Loop project.  (Docket Entry # 194-3, p. 12, ¶ 50).

('Oakmont'), which [they] then loaned to the partnerships, with the loans secured by [d]eeds of [t]rusts and personal guarantees." (Docket Entry # 194-3, pp. 2-3). The parties "agreed to make loans to the [] partnerships from [their] own personal funds, as necessary, on a fifty-fifty basis." (Docket Entry # 194-3, p. 3, ¶ 9); see (Docket Entry # 117-1, p. 2, ¶¶ 7, 17-19) (Docket Entry # 194-1, pp. 2, 5, ¶¶ 7, 17-19) (Docket Entry # 194-3, p. 18, ¶¶ 75-77). There were two "differences in the financing structure between the [] projects": (1) "Grunigen and [Taylor] [] agreed to share the profits earned by the 1210 [Fire Rock Loop] project with Oakmont under a [p]rofit [p]articipation [a]greement"; and (2) "the [d]eed of [t]rust for 1610 [Fire Rock Loop] was only granted by Grunigen, as he was the sole owner of the property, while the [d]eed of [t]rust for 1210 [Fire Rock Loop] was granted by Grunigen and [Taylor] as tenants in common." (Docket Entry # 194-3, p. 3, ¶ 10).

The parties retained a bookkeeper for the projects (Docket Entry # 117-1, pp. 2, 4, ¶¶ 10, 20) (Docket Entry # 194-1, p. 3, ¶ 10) and requested that the bookkeeper "maintain the general ledgers for [the] projects in accordance with generally accepted accounting principles ('GAAP')" (Docket Entry # 194-3, p. 4, ¶ 14); see (Docket Entry # 173, p. 3, ¶ 14); see also (Docket Entry # 117-1, p. 3, ¶ 10) (Docket Entry # 118-5, pp. 19-20).

"Between November 2013 and September 2016,"[8] the bookkeeper "maintained and, upon request, updated accounting records for the [] partnerships."  (Docket Entry # 194-3, p. 4, ¶ 14). "Except for communications and copies of backup to substantiate the transactions in the [] ledger," the bookkeeper "did not maintain any of the other partnership or land ownership business books, records, and business documents."  (Docket Entry # 173, p. 2, ¶ 9) (Docket Entry # 194-3, p. 5, ¶ 18).  The bookkeeper's records were available to the parties upon request.  (Docket Entry # 117-1, p. 3, ¶ 10) (Docket Entry # 194-3, p. 5, ¶ 19) (Docket Entry # 173, p. 2, ¶ 5).

   "From November 2013 to April 2014," and consistent with the 1610 Fire Rock Loop partnership's "internal controls," "backup documentation was provided for all project expenses paid to contractors and other third-party suppliers."  (Docket Entry # 194-3, p. 7, ¶ 31); see (Docket Entry # 194-3, p. 4, ¶ 16). "Beginning in or about April 2014, . . . Grunigen and Logan began requesting that [Taylor] advance them funds for" various construction materials and services for the 1610 Fire Rock Loop project, "either by paying them directly or by depositing money

---

[8] The bookkeeper's affidavit, filed in support of Taylor's opposition, indicates that she provided services to the parties "between June 2014 and into 2016."  (Docket Entry # 173, p. 2, ¶ 4).  For the purpose of Grunigen's motion for summary judgment (Docket Entry # 115), however, the exact time frame is immaterial.

in accounts they maintained with suppliers." (Docket Entry #
194-3, p. 7, ¶ 31). Grunigen and Logan "represented to [Taylor]
that the quantities they specified in the quotes and purchase
orders were based on takeoffs they had calculated" and
"requested that payment on change orders and expense
reimbursements without any backup and immediately" (Docket Entry
# 194-3, pp. 7-8, ¶ 31); "told [Taylor] that the advances were
needed to ensure timely completion of the 1610 [Fire Rock Loop]
project and/or to avoid price increases for materials" (Docket
Entry # 194-3, p. 8, ¶ 32); and "promised [Taylor] . . . that,
at or before completion of the project and windup, backup for
all unsubstantiated advance payments, reimbursements or change
orders they were requesting would be provided" (Docket Entry #
194-3, p. 8, ¶ 34). "Grunigen also promised [Taylor] at the
time that any excess funds or materials purchased would be
returned to the [1610 Fire Rock Loop] partnership." (Docket
Entry # 194-3, p. 8, ¶ 34).

"By early June 2014, [Taylor] [began] raising with Grunigen
concerns that Logan was becoming increasingly combative and
essentially abandoning his multiple responsibilities for the
construction of 1610 [Fire Rock Loop] and the pre-development
phase of 1210 [Fire Rock Loop] (including permitting)." (Docket
Entry # 194-3, p. 9, ¶ 36); see (Docket Entry # 119-1, p. 2, ¶
7) ("In or about 2014, . . . Taylor and [Grunigen] began to

experience disagreements.  Among other things, [the parties] had different views of the quality of the work performed by the general contractor and about certain costs of construction.").  Grunigen "dismissed [Taylor]'s concerns and defended Logan[] . . . ."  (Docket Entry # 194-3, p. 9, ¶ 37).

   "On September 14, 2014, Grunigen sold 1610 [Fire Rock Loop] to Francisco and Molly Barroso ('the Barrosos')" and subsequently delivered to them "a new home limited single-family home warranty" (the "warranty").  (Docket Entry # 194-3, p. 11, ¶¶ 46-47) (capitalization altered); see (Docket Entry # 196-2).  "Once the Barrosos took possession of 1610 [Fire Rock Loop,] they made over fifty warranty claims," one of which related to doors that leaked during rainy weather.  (Docket Entry # 194-3, pp. 12, 14, ¶¶ 50, 56); see also (Docket Entry # 119-1, p. 4, ¶ 22).  The parties disagreed as to the cause of the leaks: Taylor believed that Logan's "poor installation" was the root cause, while Grunigen maintained that the doors were defective.[9]  (Docket Entry # 20-1, ¶ 74) (Docket Entry # 29, p. 10, ¶ 74).  "In June 2016,

---

[9] Grunigen alleges that, "after [t]he door issue at 1610 Fire Rock Loop was examined numerous times, including by representatives of the door's manufacturer and by several contractors, he and the parties' lawyer at the time, Anthony DiMonte ("DiMonte"), "determined that settlement was the best course of action."  (Docket Entry # 117-1, p. 10, ¶ 59).  Taylor alleges that "[n]o inspection by a third-party neutral of the Barrosos' windows and doors was ever conducted."  (Docket Entry # 194-1, p. 30, ¶ 69); see also (Docket Entry # 194-3, p. 13, ¶ 54).

Grunigen told [Taylor] that the Barrosos were going to sue both of [the parties] if [the parties] did not pay them as much as $100,000 in settlement of their purported door leak claim." (Docket Entry # 194-3, p. 14, ¶ 57).  Taylor subsequently learned that "the Barrosos had never threatened to sue [him], [and] only threatened to sue Grunigen . . . ."[10]  (Docket Entry # 194-3, p. 14, ¶ 58).  In November 2017, "Grunigen represented to [Taylor] that" an inspection of the doors in July 2017 "and [the] circumstances established liability under [the] [] warranty, that Logan, the Barrosos, and their pool and patio contractors had no liability, and that without a $50,000 payment to the Barrosos, they would sue both" parties.  (Docket Entry # 194-3, p. 14, ¶ 60).  Grunigen also told Taylor that he needed his agreement to settle with the Barrosos so that DiMonte could "begin drafting a settlement agreement and that he would provide . . . . backup documentation to support his representation that" the doors themselves were faulty, "that water intrusion existed, and that it was covered under [the] warranty."[11]  (Docket Entry # 194-3,

---

[10] Grunigen maintains that, in *2017*, the Barrosos threatened to sue *both* him and Taylor.  (Docket Entry # 117-1, p. 9, ¶ 55) (Docket Entry # 119-1, p. 4, ¶ 22).  In adjudicating Grunigen's motion for summary judgment, however, this court must review the record in the light most favorable to Taylor.  See Garcia-Garcia, 878 F.3d at 417.

[11] Taylor also indicated to Grunigen that, along with the backup documentation, a condition to his agreement to settle with the Barrosos was that there be "a neutral third-party evaluation" of the leak issue.  (Docket Entry # 118-5, p. 253).

pp. 14-15, ¶ 60).

After Taylor agreed to move forward with the settlement,
Grunigen settled with the Barrosos "by paying . . . $55,000.00
on June 11, 2018."[12]  (Docket Entry # 119-1, p. 4, ¶ 22); see
(Docket Entry # 194-3, pp. 14-15, ¶¶ 60-61).  It "was not until
2019 that Grunigen advised [Taylor] that he had paid the
Barrosos $55,000 in June [2018] . . . ."  (Docket Entry # 194-3,
p. 15, ¶ 61); see also (Docket Entry # 119-1, p. 4, ¶ 23)
(Grunigen affirming that, on June 11, 2018, he "wired $55,000
from [his] personal checking account to" the Barrosos "to settle
the claim").  Taylor later testified that, during his settlement
discussions with Grunigen and DiMonte, he "was on antipsychotics
. . . and Trazodone, and also for a period painkillers . . . ."
(Docket Entry # 118-5, p. 257).  Taylor has refused to pay half
of the $55,000 settlement payment (Docket Entry # 117-1, pp. 9-
10, ¶¶ 56, 60) (Docket Entry # 194-1, pp. 11-12, ¶¶ 56, 60), and
Grunigen has never provided Taylor with a copy of the settlement
agreement (Docket Entry # 194-3, p. 15, ¶ 62).

In June 2015, a couple months after Taylor realized the
parties "were about to exhaust the money . . . borrowed from

---

[12] Grunigen maintains that he did so "on the advice of counsel"
(Docket Entry # 119-1, p. 4, ¶ 22), but Taylor alleges that he
"has never received from DiMonte . . . or Grunigen documentation
supporting Grunigen's claim . . . that DiMonte had recommended
to Grunigen that he settle with the Barrosos to avoid expensive
litigation."  (Docket Entry # 194-3, p. 16, p. ¶ 66).

Oakmont and lent to the 1210 [Fire Rock Loop] partnership,"
"[Taylor] began contributing more than [his] fifty-percent share
to the payment of [the 1210 Fire Rock Loop] partnership['s]
expenses."  (Docket Entry # 194-3, p. 20, ¶¶ 87-88).  "From
October 2015 until August 2016, Grunigen did not contribute
towards" the expenses of, "or devote much time to the . . .
business or management of," the 1210 Fire Rock Loop project or
partnership, "while [Taylor] continued . . . to manage the [1210
Fire Rock Loop] project with Derrick and make additional loans
to the [1210 Fire Rock Loop] partnership to cover expenses
incurred in completing a short punch list, landscaping, and
detailing."  (Docket Entry # 194-3, pp. 20-21, ¶ 93); see also
(Docket Entry # 117-1, p. 4, ¶ 21).  Taylor did so on the
"expect[ation] that Grunigen would pay [him] the amount needed
to balance [the parties'] loan accounts at closing or during the
windup . . . ."  (Docket Entry # 194-3, p. 21, ¶ 93).

     "In August 2015, [Taylor] advised Grunigen that [he] was
experiencing health issues and that [he] was going to return
home to Massachusetts to seek medical treatment."  (Docket Entry
# 194-3, p. 21, ¶ 98).  "Between March 2016 and thereafter[,]
[Taylor] kept either Grunigen [or] DiMonte generally informed
about [his] declining health issues and treatment as they
progressed."  (Docket Entry # 194-3, p. 21, ¶ 99).

     In his later depositions, Taylor testified that: "the

amount . . . he advanced to pay 1210 Fire Rock Loop project bills was $90,764.60" (Docket Entry # 117-1, p. 4, ¶ 23) (Docket Entry # 194-1, p. 5, ¶ 23); "Grunigen did not pay his proportionate share of 1210 Fire Rock Loop project expenses" (Docket Entry # 117-1, p. 5, ¶ 25) (Docket Entry # 194-1, p. 6, ¶ 25); "from the summer of 2016 until the fall of 2018, [Taylor] 'absolutely' lacked the mental capacity to make business decisions" (Docket Entry # 117-1, p. 4, ¶ 28) (Docket Entry # 194-1, p. 5, ¶ 26); "during the time he . . . lacked the mental capacity to make business decisions, he had been diagnosed with a 'severe episode of recurrent major depressive disorder with psychotic features' and had been prescribed Trazodone and Trileptal" (Docket Entry # 117-1, p. 4, ¶ 28) (Docket Entry # 194-1, p. 5, ¶ 28)[13]; "from the summer of 2016 to the fall of 2018[,] [Taylor] put business decisions in the hands of Grunigen and . . . DiMonte, because [Taylor] could not take care of his day to day needs and lacked the 'capacity to do anything'" (Docket Entry # 117-1, p. 4, ¶ 29) (Docket Entry # 194-1, pp. 5-6, ¶¶ 27, 29)[14]; and that "because [Taylor] was unable to

_____

[13] In a response to one of Grunigen's interrogatories, Taylor noted that "by December 2016, [he] was in a 40-hour per week outpatient mental health program, and was also preparing to undergo kidney surgery . . . ."  (Docket Entry # 118-6, p. 11); see (Docket Entry # 117-1, p. 5, ¶ 26).

[14] Taylor disputes this fact "as incomplete" because, although he "trusted Grunigen and DiMonte to protect his interests[,] [t]hey did not."  (Docket Entry # 194-1, pp. 6-7, ¶¶ 27-29).  The fact

function mentally, he charged Grunigen with 'taking care of the Fire Rock stuff' and to act on his behalf" (Docket Entry # 117-1, p. 4, ¶ 31) (Docket Entry # 194-1, p. 5, ¶ 31).

"Because of Taylor's [] inability to participate in the [parties'] business affairs . . ., the parties, on the advice of mutually-retained counsel, agreed to place the 1210 [Fire Rock Loop] project property in a two-member limited liability company and Grunigen agreed to assume responsibility for the parties' business decisions."[15]  (Docket Entry # 117-1, p. 6, ¶ 33) (Docket Entry # 194-1, p. 7, ¶ 33) see (Docket Entry # 194-1, p. 52, ¶ 172) (Docket Entry # 194-3, p. 23, ¶ 106); see also (Docket Entry # 198, p. 14) (email in which DiMonte notes that "the plan . . . is to transfer title into an LLC to streamline the process of transferring title while [] Taylor is engaged with a personal health issue").  The parties formed the 1210 Fire Rock, LLC (the "LLC"), of which Grunigen was a managing member and Taylor was a non-managing member.  (Docket Entry #

---

presented by Grunigen that Taylor "put business decisions in the hands of Gruingen" and DiMonte because of his lack of capacity does not suggest that Grunigen and DiMonte ultimately protected his interests.  This court therefore includes the fact as presented by Grunigen, as it is not a genuine dispute of material fact.  See Fed. R. Civ. P. 56(a).
[15] Taylor disputes this fact "as incomplete to the extent it suggests that Grunigen fulfilled his responsibilities as LLC manager, which [Taylor alleges] he did not."  (Docket Entry # 194-1, p. 7, ¶ 33).  This court disagrees that Grunigen's statement makes such a suggestion and therefore admits this fact, as presented by Grunigen.  See Fed. R. Civ. P. 56(a).

119-2, p. 1).  "DiMonte and ADLI Law Group [('ADLI')] provided legal services to the LLC and Grunigen from [the LLC's] formation . . . through the sale of 1210 Fire Rock Loop by the LLC on March 9, 2017."  (Docket Entry # 194-3, p. 28, ¶ 139).

"On January 4, 2017, Taylor and Grunigen entered into the 'Operating Agreement of 1210 Fire Rock, LLC,' which . . . govern[ed] the conduct of the affairs of the LLC" (the "operating agreement").[16]  (Docket Entry # 117-1, p. 6, ¶ 34); see (Docket Entry # 194-1, p. 8, ¶ 34) (Docket Entry # 194-1, p. 52, ¶ 173); see also (Docket Entry # 119-2) (operating agreement).  The parties subsequently executed deeds conveying their individual interests in 1210 Fire Rock Loop to the LLC.  (Docket Entry # 194-3, p. 23, ¶¶ 110-11).  After learning that the filing of a "preliminary change of ownership" form was required for proper conveyance of the property via the executed deeds, Taylor "made numerous requests that Grunigen file the form" but "none has been filed" to date.  (Docket Entry # 194-3, p. 24, ¶¶ 113-14).  To Taylor's knowledge, "Grunigen never

---

[16] Taylor disputes that the parties' entered into the operating agreement on January 14, 2017, suggesting instead that the parties did so "[o]n or about February 13, 2017."  See (Docket Entry # 194-1, p. 8, ¶ 34) (Docket Entry # 120-1, p. 6, ¶ 17).  The operating agreement itself, however, provides that it was "made as of January 4, 2017."  (Docket Entry # 119-2, p. 2).  Regardless, whether the correct date the parties entered into the agreement was January 4, 2017 or February 13, 2017 is immaterial for the purposes of defendant's motion for summary judgment (Docket Entry # 115).  See Fed. R. Civ. P. 56(a).

retained a bookkeeper to prepare and maintain financial ledgers
for the LLC and did not maintain them himself."  (Docket Entry #
194-3, p. 24, ¶ 116).

The operating agreement is governed by California law.  See
(Docket Entry # 119-2, p. 25, section 14.04).  Under the
operating agreement, the LLC's management is "vested in the
[m]anaging [m]ember," Grunigen, who has the "exclusive power and
authority . . . to carry out the purposes of the [LLC] to
perform all acts and . . . undertakings which [he] may deem
necessary or advisable . . . and to take all actions not
inconsistent with . . . [the] [a]greement necessary to operating
the . . . [LLC] in accordance with [the] [a]greement and the
laws of California."  (Docket Entry # 119-2, p. 6, section
3.02(A)).  As the managing member, Grunigen possesses a "duty of
care in the discharge of" his duties to the LLC and Taylor that
"is limited to refraining from engaging in grossly negligent
conduct, intentional misconduct, or a knowing violation of the
law."  (Docket Entry # 119-2, p. 6, section 3.07(A)); see
(Docket Entry # 117-1, p. 6, ¶ 36) (Docket Entry # 194-1, p. 8,
¶ 36).  "[I]n the event of a disagreement regarding any
financial records or any matter related thereto," the operating
agreement states that "the parties shall in good faith attempt
to resolve such disagreement . . . [and] if the parties cannot
agree such parties shall each submit their positions, together

with the basis for such positions, to any mutually acceptable
third party."  (Docket Entry # 119-2, p. 13, section 6.04); see
(Docket Entry # 117-1, p. 6, ¶ 35) (Docket Entry # 194-1, p. 8,
¶ 35).

With respect to capital contributions to the LLC, the
operating agreement provides, inter alia, that: (1) "in the
event that . . . funds . . . in excess of available loan
proceeds . . . are required to pay . . . expenditures of the
[LLC] . . ., then upon [m]ajority [a]pproval of the [m]embers,
each [m]ember shall contribute to the capital of the [LLC] . . .
his proportionate share of such required additional funds"
(Docket Entry # 119-2, p. 8, section 4.04(A)); (2) "the failure
by any [m]ember . . . to make any additional capital
contribution within fifteen (15) days after [the LLC's] demand .
. . shall constitute . . . default by such [m]ember under [the]
[operating] [a]greement" (Docket Entry # 119-2, p. 8, section
4.04(B)(i)); and (3) "[a]fter an event of default . . ., the
defaulting [m]ember shall repay to the non-defaulting [m]embers
the amounts advanced on such [m]ember's behalf, together with
interest thereon . . ." and the non-defaulting members may
"bring an action in law or in equity . . . to collect all
amounts to which the non-defaulting [m]embers are entitled [],
plus all costs and expenses of maintain such suit . . . ."
(Docket Entry # 119-2, p. 8, section 4.04(B)(ii)); see (Docket

Entry # 117-1, p. 6, ¶ 37) (Docket Entry # 194-1, p. 8, ¶ 37).
"No vote for [m]ajority [a]pproval," which would trigger the
default provision in section 4.04(B)(i) of the operating
agreement, "was ever taken for a capital contribution call."
(Docket Entry # 117-1, p. 7, ¶ 39) (Docket Entry # 194-1, p. 9,
¶ 39); see (Docket Entry # 119-2, p. 8, section 4.04(B)(i)).
Finally, section 6.02 of the operating agreement requires
Grunigen to maintain and, after the end of each fiscal year,
furnish to Taylor certain financial and tax documents of the
LLC.  (Docket Entry # 119-2, pp. 11-12, sections 6.02(C), (D)).
The operating agreement requires that the financial statements
be prepared in accordance with GAAP.  See (Docket Entry # 119-2,
p. 12, section 6.02(C)).

"Immediately prior to the closing of the 1210 Fire Rock
Loop [p]roject, Taylor communicated with the title company and
his attorney to discuss what he claimed was a loan to the LLC in
the approximate amount of $66,519.26." (Docket Entry # 117-1,
p. 7, ¶ 43) (Docket Entry # 194-1, p. 9, ¶ 43); see (Docket
Entry # 20-1) ("In January 2017, Messrs. Grunigen and DiMonte
received a demand, via FATCO [the title company], that Taylor be
paid from the closing on 1210 Fire Rock Loop the approximately
$66,519.26 he had lent the [1210 Fire Rock Loop]
[p]artnership/LLC to complete 1210 Fire Rock Loop.").  Taylor
subsequently testified, inter alia, that: (1) he told the title

company "the amount could change" in that it "could go up or down or might go away" (Docket Entry # 117-1, p. 7, ¶ 44) (Docket Entry # 194-1, p. 9, ¶ 44); see (Docket Entry # 118-5, p. 317); (2) he received an email from DiMonte noting that his "contribution [of the $66,519.26] had to come off the closing statement" (Docket Entry # 118-5, pp. 317-18); see (Docket Entry # 117-1, p. 7, ¶ 45) (Docket Entry # 194-1, p. 9, ¶ 45); and (3) DiMonte "struck [] off" the "contribution," which Taylor suggests was done with Grunigen's authorization (Docket Entry # 118-5, pp. 318-19) ("[]DiMonte struck [the contribution] off . . . . I have no reason to believe he would do anything without having the LLC manager authorize him to do that."). Taylor also testified that Grunigen and DiMonte "never assigned [his] loan to the LLC." (Docket Entry # 118-5, pp. 320). He further testified that he advanced $90,764.06 to the 1210 Fire Rock Loop partnership "based on the filed tax returns and the final verified financials" and explained that he previously alleged that he had advanced approximately $134,000 based on "the best knowledge available to [him]" at the time.[17] (Docket Entry #

---

[17] The amended complaint alleges that Taylor "made loans to . . . *[the] LLC* totaling $134,113.53 (including interest) . . . ." (Docket Entry # 20-1, p. 44, ¶ 168) (emphasis added). Taylor later testified that he was "really not a hundred percent sure if [he] made a loan to the . . . [1210 Fire Rock Loop] LLC," as opposed to the 1210 Fire Rock Loop partnership. (Docket Entry # 118-5, pp. 457-59). He then noted, based on "the true and best information" available at the time of his deposition, that he

118-5, pp. 317-18); <u>see also</u> (Docket Entry # 117-1, p. 8, ¶ 49)

(Docket Entry # 194-1, p. 10, ¶ 45) (Docket Entry # 194-3, pp.

26-27, ¶¶ 132-33).  "In 2017, the 1210 Fire Rock Loop project

was sold."[18]  (Docket Entry # 117-1, p. 7, ¶ 41) (Docket Entry #

---

"loaned approximately $90,764.50 out of [] pocket to the [1210
Fire Rock Loop] project," "[n]one of" which "was advanced to the
LLC."  (Docket Entry # 118-5, pp. 459, 461, 463).  In his
affidavit filed in support of his opposition to Grunigen's
motion for summary judgment, Taylor indicates that he made loans
to both the 1210 Fire Rock Loop partnership and LLC.  (Docket
Entry # 194-3, p. 26, ¶ 132).  He also affirms that "[t]he
principal amount of [his] loan during the 1210 [Fire Rock Loop]
[p]artnership" was "between $85,000 and $95,000 through the
reconciliation process" and, with the addition of "the amounts
[he] loaned to the LLC in 2017, "the total principal" was
"around $120,000."  (Docket Entry # 194-3, p. 27, ¶ 134).
[18] In Grunigen's statement of facts, he states that plaintiff's
"alleged loans were never listed on the books and records of the
1210 [Fire Rock Loop] [p]artnership or the . . . LLC, but even
if the funds allegedly loaned by Taylor to the partnership had
been loaned to the LLC, none of the conditions that would
trigger the payment of interest, costs and fees, was met."
(Docket Entry # 1117-1, p. 8, ¶ 50).  In attempting to dispute
this, Taylor cites to three paragraphs in his statement of
additional facts in which he discusses the "estimated principal
amount [he] claims . . . he is owed on his loans to the 1210
[Fire Rock Loop] partnership and the LLC."  (Docket Entry # 194-
1, p. 55, ¶ 195); <u>see</u> (Docket Entry # 194-1, p. 10, ¶ 50).  This
does not genuinely dispute Grunigen's proposed fact that
Taylor's "alleged loans were never listed on the books and
records of the 1210 [Fire Rock Loop] [p]artnership or the . . .
LLC."  (Docket Entry # 1117-1, p. 8, ¶ 50).  Taylor also notes,
however, that "Grunigen has thus far refused to provide final,
reconciled, verified and complete books of account for the LLC."
(Docket Entry # 194-1, p. 55, ¶ 195); <u>see</u> (Docket Entry # 194-3,
p. 27, ¶ 133).  Thus, because Taylor suggests that it is unclear
whether the final books and records would reflect his purported
loans, and because this court must review the record in the
light most favorable to Taylor, this court declines to admit on
summary judgment Grunigen's proposed fact that the loans were
never reflected on the books and records of the 1210 Fire Rock
Loop partnership or LLC.  <u>See</u> <u>Garcia-Garcia</u>, 878 F.3d at 417.

194-1, p. 9, ¶ 41).

Around "the sale of 1210 Fire Rock Loop project," Grunigen began working with "Taylor's friend and attorney-in-fact, Kenley Branscome ('Branscome') to assist in working with the bookkeeper and preparing the necessary K-1's for the LLC." [19]   (Docket Entry # 117-1, p. 8, ¶¶ 51-52) (Docket Entry # 194-1, p. 10, ¶¶ 51-52).   "On May 17, 2018, Branscome reported to Grunigen that he had the ledger, and that the K-1[] could be completed [based on the ledger], once Grunigen" sent him an email with the "expenses."   (Docket Entry # 117-1, p. 8, ¶ 53) (Docket Entry # 194-1, p. 11, ¶ 53); see (Docket Entry # 163-1) (May 17, 2018 email from Branscome to Grunigen).   On May 31, 2018, Grunigen reported to Branscome that he was "working on [the] expenses for the k1's [sic]."   (Docket Entry # 163-1, p. 20).   On September 13, 2018, Grunigen asked Branscome to "send [him] the k1's

---

[19] Grunigen alleges that, after the sale of 1210 Fire Rock Loop, he relied on Branscome "to assist in working with the bookkeeper and preparing the necessary K-1's for the LLC."   (Docket Entry # 117-1, p. 8, ¶ 51).   An affidavit by the bookkeeper indicates that she "never worked with [] Branscome in any capacity related to 1610 or 1210 [Fire Rock Loop] and [has] not communicated with him in over a decade."   (Docket Entry # 183, p. 3, ¶ 12). Branscome, in his own affidavit, confirms that he did not have any contact with the bookkeeper, that he began assisting Grunigen with the 1210 Fire Rock Loop project on Taylor's behalf in or around September 2016 (when Taylor's "mental and physical health" declined), and that he agreed to help Grunigen prepare the LLC's 2017 K-1 form and locate "any financial ledger for the LLC [he] could find."   (Docket Entry # 163, pp. 4-6, ¶¶ 15, 21-23); see (Docket Entry # 117-1, p. 8, ¶¶ 51-52) (Docket Entry # 119-1, p. 3, ¶¶ 17-18).

[sic]" and instructed Branscome to "just use the [HUD] and disregard [Grunigen]'s additional expenses" because he did not "care about the loss."  (Docket Entry # 163-1) (September 13, 2018 text from Grunigen to Branscome); (Docket Entry # 119-2, p. 37) (same).  When Branscome failed to respond, Grunigen followed up on his request three times before Branscome finally indicated he would have the K-1 ready by October 10, 2018.  See (Docket Entry # 163-1, p. 22).  Branscome prepared the K-1 form with the ledger and HUD statement but without any "other information or documents."  (Docket Entry # 163, p. 6, ¶¶ 26-27).  He sent a draft of the K-1 form to Grunigen on October 15, 2018.  (Docket Entry # 163, p. 7, ¶ 27); see (Docket Entry # 119-3, p. 2) (October 15, 2018 email from Branscome to Grunigen).

"In April 2019, [Taylor] became aware that, during the period Grunigen managed the LLC, at least $20,423 of the funds" in a trust account Taylor had established with ADLI "were used to pay for matters related to the LLC without [his] authorization."  (Docket Entry # 194-3, p. 28, ¶ 141).  The trust funds were "only to be used to cover [Taylor's] personal legal expenses while [he] was ill."  (Docket Entry # 194-3, p. 28, ¶ 140).  Despite Taylor's requests that Grunigen and/or DiMonte "refund the funds debited from [his trust] account or at least half plus the overcharges for check cashing and a double billing and [] their assurances . . . that the funds would be

returned," no funds have been returned to Taylor.  (Docket Entry # 194-3, p. 28, ¶ 142).

On June 7, 2019, Taylor emailed Gary Casmano of Oakmont and requested that he forward various documentation "regarding 1210 Fire Rock Loop," including a "copy of [the] 'audit' of 1210 Firerock [sic] project records that [Casmano] indicated was being completed in 2017."  (Docket Entry # 198-3, p. 1).  Taylor then forwarded the email to Grunigen, requesting that he, "as manager of [the] [LLC]," "follow up with [Casmano] to ensure he promptly responds to" Taylor's requests.  (Docket Entry # 198-3, p. 1).  On June 11, 2019, Taylor emailed Grunigen and requested a "copy of the cancelled check to Francisco [Barroso] for $55,000," a "copy of any cancelled checks that should be added to the project ledgers for a final CPA validation," and an update on the "[s]tatus [of] the LLC [t]ax [r]eturn and proposal for validating the 1210 [Fire Rock Loop] project ledger." (Docket Entry # 198-3, p. 5).

On June 10, 2019, Taylor noted in an email to Grunigen that Grunigen owed him "a debt in the amount of $121,156 . . . plus interest for the debt related to the 1210 Firerock [sic] Loop matter," which was "originally due in full on or about March 8, 2017."  (Docket Entry # 198-2, p. 30).  Taylor also "recognized [that Grunigen] may have off-sets up to $27,500 to the total amount due with regards to the 1610 Fire rock loop door leak

matter . . . ."  (Docket Entry # 198-2, p. 30).  Taylor
requested that Grunigen "forward copies of all documentation and
third party evaluations [he] used to determine the $12,000 +/-
of doors were defective, substantiated a $50,000 settlement as a
reasonable, and that an added $5,000 was due the [Barrosos]," as
well as "copies of [the] executed settlement agreement,
cancelled check payable to the [Barrosos] and evidence the
subject doors were replaced."  (Docket Entry # 198-2, p. 30).

   According to Taylor, "Grunigen has thus far refused to
provide final, reconciled, verified and complete books of
account for the LLC."[20]  (Docket Entry # 194-3, p. 27, ¶ 133).
Grunigen belatedly filed the LLC's 2017 tax return in 2021.
(Docket Entry # 119-1, p. 4, ¶ 26); see (Docket Entry # 117-1,
p. 10, ¶ 63) (Docket Entry # 194-1, p. 12, ¶ 64) (Docket Entry #
194-3, p. 31, ¶ 156).  "Taylor and his accountant [initially]
told [Grunigen] that, in their opinion, [the LLC tax return]
need not be filed,"[21] but Grunigen ultimately filed the tax

---

[20] Grunigen, in turn, maintains that he has "repeatedly provided
whatever books and records [he has] for the LLC to Taylor, but
[has] not provided them according to GAAP, as [he has] been
advised that GAAP preparation has no application in this case,
and because such effort would be very expensive."  (Docket Entry
# 119-1, p. 4, ¶ 25).
[21] Although plaintiff disputes this fact (Docket Entry # 194-1,
pp. 12-13, ¶ 64), it is admitted on summary judgment because he
failed to cite to the record in disputing such fact.  See L.R.
56.1; Fed. R. Civ. P. 56(e); Cochran, 328 F.3d at 12; Stonkus,
322 F.3d at 102; see also Brown v. CitiMortgage, Inc., No. CV
16-11484-LTS, 2018 WL 2739932, at *2 (D. Mass. Apr. 13, 2018)

return "[w]hen Taylor changed his mind."   (Docket Entry # 119-1,
p. 4, ¶ 26).

DISCUSSION

Defendant moves this court to: (1) "enter summary judgment
on . . . all counts currently remaining in the [a]mended
[c]omplaint[] in his favor[] by dismissing each such count with
prejudice"; and (2) "grant summary judgment in his favor on both
counts set forth in his [c]ounterclaims, with entry of judgment
in the amount of $27,500.00 against [plaintiff]."   (Docket Entry
# 115, p. 1).   As noted previously, counts I, II, III, V, and VI
are the remaining causes of action before this court.   See
(Docket Entry # 207).

A.   Count I: Violation of Section 17704.10(c) of RULLCA

Count I alleges violation of section 17704.10(c) of RULLCA
("section 17704.10(c)"), which requires a manager of "a limited
liability company with more than 35 members" to "cause an annual
report to be sent to each of the members not later than 120 days

---

("[Plaintiff] purports to dispute [defendant's] assertion of
fact but cites no admissible evidence.   Thus, the fact is deemed
admitted.").   Plaintiff's (purportedly "corrected") response to
defendant's statement of facts and plaintiff's statement of
additional facts (together, Docket Entry # 194-1) are littered
with not only typographical errors (e.g., plaintiff's surname is
misspelled as "TacOylor" in the very first sentence of his
response) but also incorrect citations to the record, which puts
the burden on this court to sift through the various affidavits
and other documents he filed to find the correct references.
This court, however, cannot work around plaintiff's failure to
cite to the record at all.

after the close of the fiscal year," and such report must include "an income statement and a statement of cashflows for the fiscal year."  Cal. Corp. Code § 17704.10(c); see (Docket Entry # 20-1, pp. 41-42).  Along with other defenses to Count I, defendant argues that plaintiff "cannot establish that he is entitled to any relief" under section 17704.10(c) because that section applies only to limited liability companies with more than 35 members and the "1210 Fire Rock LLC is a two-member entity."  (Docket Entry # 116-2, p. 8).  Plaintiff does not deny that section 17704.10(c) is applicable to only limited liability companies with more than 35 members (and that the LLC has only two members) but nevertheless insists that defendant's reliance on section 17704.10(c) is "misplaced" because the operating agreement required defendant "to prepare and maintain books of account in accordance with GAAP and provide a statement of the balance in Taylor's capital account . . . ."  (Docket Entry # 194-2, p. 3).

Plaintiff entirely misses (or, more accurately, ignores) the point.  As defendant notes, it is undisputed that the LLC consists (and always has consisted) solely of two members: plaintiff and defendant.  (Docket Entry # 116, p. 8); see (Docket Entry # 20-1, p. 32, ¶ 119) (Docket Entry # 117-1, p. 6, ¶ 33) (Docket Entry # 194-1, p. 7, ¶ 33); see also (Docket Entry # 194-1, p. 52, ¶ 172) (Docket Entry # 194-3, p. 23, ¶ 106).  It

is also clear that section 17704.10(c) applies only to those
companies with more than 35 members.  See Cal. Corp. Code §
17704.10(c).  Accordingly, plaintiff is not entitled to relief
under section 17707.10(c), summary judgment on Count I is
appropriate, and this court need not address the parties' other
arguments as to Count I.[22]  See Cal. Corp. Code § 17704.10(c);
Fed. R. Civ. P. 56(a).

    B.   Count II: Breach of the Operating Agreement

    Count II alleges that defendant breached various provisions
of the operating agreement.  (Docket Entry # 20-1, p. 44).  The
amended complaint first alleges that defendant, as managing
member of the LLC, breached his obligation under section 6.02(C)
of the operating agreement ("section 6.02(C)") to, within 90 days
of the end of each fiscal year:

> prepare an [a]nnual [r]eport of the LLC which included a
> balance as of the end of such fiscal year; a profit and
> loss statement for the LLC for such fiscal year; a
> statement of the balance in [defendant] and [plaintiff]'s
> capital account; the amount of their shares of the LLC's
> income, gain, losses, deductions and other relevant items
> for [f]ederal income tax purposes; and copies of any
> other financial statements of the [LLC] (balance sheets,
> statements of income, statement of the members' equity,
> and statement of cash flows) prepared in accordance with
> GAAP.

(Docket Entry # 20-1, pp. 42-43, ¶¶ 163-64); see (Docket Entry #

---

[22] Additionally, to the extent that plaintiff now relies on a
breach of the operating agreement to seek relief under Count I,
plaintiff already alleges a breach of the agreement in Count II.
See (Docket Entry # 20-1, p. 42).

119-2, p. 12, section 6.02(C)).  The amended complaint next
alleges that defendant "breached his obligations under [s]ection
6.02(D) of the [o]perating [a]greement" ("section 6.02(D)"):

> by failing to prepare or cause to be prepared all
> [f]ederal, [s]tate, and local income tax and information
> returns for the . . . LLC on a timely basis, cause such
> tax and information returns to be filed with the
> appropriate governmental authorities, and [] forward to
> [plaintiff], within seventy-five (75) days after the end
> of each fiscal year, a true copy of the LLC's information
> return filed with the Internal Revenue Service for the
> preceding fiscal year.

(Docket Entry # 20-1, p. 43, ¶ 166); see (Docket Entry # 119-2,
p. 12, section 6.02(D)).  Third, the amended complaint alleges
that defendant breached his obligation under section 4.04(A) of
the operating agreement ("section 4.04(A)") "to contribute to
the capital of the LLC his proportionate share of [] required
additional funds," while plaintiff loaned $134,113.53 to the
LLC.[23]  (Docket Entry # 20-1, p. 43-44, ¶¶ 167-68); see (Docket
Entry # 119-2, p. 8, section 4.04(A)).  Additionally, according
to plaintiff, defendant's "failure to make an additional capital
contribution" under section 4.04(A) "constituted an event of
default under the [o]perating [a]greement" that entitles
plaintiff to repayment of his loans and certain interest thereon
(along with, potentially, plaintiff's costs and expenses of

---

[23] As noted previously, plaintiff testified that: (1) "[t]he
number now" of "what [he is] owed" is no longer $134,113.53 and
instead $90,764.06, "based on the filed tax returns and final
verified financials."  (Docket Entry # 118-5, p. 463).

maintaining this action).  (Docket Entry # 20-1, p. 43, ¶¶ 170-71); <u>see</u> (Docket Entry # 119-2, p. 8, section 4.04(A)).

In moving for summary judgment on Count II, defendant presents the following arguments: (1) defendant fulfilled his obligation under the operating agreement to prepare and deliver to plaintiff the requisite LLC financials (albeit, not according to GAAP); (2) defendant filed the LLC's tax return "for the one year (2017) of its existence" (albeit, late); (3) defendant is not obligated to pay half of plaintiff's alleged loan of $134,113.53 because the loan was to the 1210 Fire Rock partnership (rather than the LLC) and "[a]ny claims for funds advanced to an oral partnership are subject to a two year statute of limitations, which expired" before the complaint was filed; (4) "nowhere in Count II does [plaintiff] allege that he suffered any harm as a result of any of [defendant's] actions or inactions," despite "an allegation of such harm [being] an essential element of [plaintiff]'s claims under Count II"; and plaintiff "is barred from relief from this [c]ourt" for a breach of the operating agreement because he "failed to comply with a condition precedent" of the operating agreement (Docket Entry # 116-2, pp. 9-11).[24]

---

[24] The "condition precedent" that defendant cites is a provision stating: "in the event of a disagreement regarding any financial records or any matter related thereto, the parties shall in good faith attempt to resolve such disagreement . . . [and] if the

1.   Defendant's Failure to Prepare
     the LLC's Financials According
     to GAAP in Breach of Section 6.02(C)

Under section 6.02(C), defendant – as the managing member

of the LLC – had an obligation to:

> furnish to each [m]ember [i.e., plaintiff], within
> ninety (90) days after the end of each fiscal year, an
> annual report of the [LLC] . . . [that] include[s] a
> balance as of the end of such fiscal year; a profit and
> loss statement of the [LLC] for such fiscal year; a
> statement of the balance in the capital account of such
> [m]ember; the amount of such [m]ember's share of the
> [LLC]'s income, gain, losses, deductions and other
> relevant items for [f]ederal income tax purposes; and
> copies of any other financial statements of the [LLC]
> (balance sheets, statement of income, statement of
> [m]ember's equity, and statement of cash flows) prepared
> in accordance with GAAP.

See (Docket Entry # 119-2, p. 12, section 6.02(C)).  Defendant

admits that, although he "did cause the LLC financials to be

prepared and delivered, [he] did not do so according to GAAP, as

he had been advised that GAAP has no application under the

circumstances and would [be] a [sic] unnecessary expense."

(Docket Entry # 116-2, p. 9, n. 1); see (Docket Entry # 119-1,

p. 4, ¶ 25) (defendant affirming as such).  He therefore

breached his obligation under section 6.02(C) to prepare the

financial documents required thereunder in accordance with

---

parties cannot[,] . . . such parties shall each submit their
positions . . . to [a] mutually acceptable third party."
(Docket Entry # 116-2, pp. 9-10).  (Docket Entry # 116-2, pp. 9-
10) (quoting (Docket Entry # 119-2, p. 13, section 6.04)).

GAAP.[25]  <u>See</u> (Docket Entry # 119-2, p. 12, section 6.02(C)).

> 2. **Defendant's Failure to Timely**
> **File the LLC's Tax Returns**
> **in Breach of Section 6.02(D)**

Under section 6.02(D), defendant - as the managing member of the LLC – had an obligation to file the LLC's tax returns "on a timely basis" and to, within 75 days of the end of each fiscal year, forward to plaintiff "a true copy of the [LLC's] information return filed with the Internal Revenue Service . . . ."  <u>See</u> (Docket Entry # 119-2, p. 12, section 6.02(D)). Defendant concedes that, although he filed the LLC's tax return for 2017 ("the one year . . . of its existence"), he was "late" in doing so.  (Docket Entry # 116-2, p. 10).  He therefore breached his obligation under section 6.02(D) to file the LLC's tax returns in a "timely" manner.  <u>See</u> (Docket Entry # 119-2, p.

---

[25]  Under section 3.07 of the operating agreement ("section 3.07"), defendant possesses a "duty of care in the discharge of" his duties to the LLC and plaintiff that "is limited to refraining from engaging in grossly negligent conduct, intentional misconduct, or a knowing violation of the law." (Docket Entry # 119-2, p. 6, section 3.07(A)); <u>see</u> (Docket Entry # 117-1, p. 6, ¶ 36).  Additionally, in discharging his duties, defendant is "fully protected in relying in good faith upon the records of the [LLC] and upon such information, opinions, reports or statements by" plaintiff or his agents "as to matters . . . [he] reasonably believes are within such person[s'] professional or expert competence . . . ."  (Docket Entry # 119-2, p. 6, section 3.07(A)).  Because defendant does not cite or otherwise rely on section 3.07 to defend his breaches of the operating agreement alleged in Count II, this court does not address section 3.07 in evaluating whether summary judgment is appropriate as to Count II.

12, section 6.02(D)).  He defends his untimely filing of the

LLC's 2017 tax return on the basis that he did so only "after

[plaintiff] and his accountant earlier took the position that

they need not be filed, insofar [as] the members had reported

their income from the [1210 Fire Rock Loop] partnership and no

taxes would be due."  (Docket Entry # 116-2, p. 10); <u>see</u> (Docket

Entry # 119-1, p. 4, ¶ 26) (defendant affirming as such).  As

noted previously, plaintiff failed to properly dispute this fact

and therefore it is admitted on summary judgment.  <u>See</u> L.R.

56.1; <u>Cochran</u>, 328 F.3d at 12; <u>Stonkus</u>, 322 F.3d at 102; <u>Brown</u>,

2018 WL 2739932, at *2.  Defendant does not, however, cite any

caselaw (or any authority) demonstrating how his reliance on the

opinions of plaintiff and his accountant excuses his breach of

section 6.02(D).[26]

---

[26] As further detailed below, defendant frequently fails to cite
supporting authorities in his brief.  Under L.R. 7.1(b)(1), a
movant is required to file with his or her motion "a memorandum
of reasons, including *citation of supporting authorities*, why
the motion should be granted."  L.R. 7.1(b)(1) (emphasis added).
This court "'enjoy[s] broad latitude in . . . administering
[the] local rules'" and "may 'demand adhered to specific
mandates contained in the local rules.'"  <u>Blanchard v. Cortes-</u>
<u>Molina</u>, 453 F.3d 40, 46 (1st Cir. 2006) (brackets in original
omitted) (quoting <u>NEPSK, Inc. v. Town of Houlton</u>, 283 F.3d 1, 6
(1st Cir. 2002)); <u>see</u> <u>Rissman Hendricks & Oliverio, LLP v. MIV</u>
<u>Therapeutics Inc.</u>, No. CV 11-10791-MLW, 2013 WL 12321564, at *1
(D. Mass. June 14, 2013) ("A district court may deny a motion,
without prejudice, for failure to comply with the Local
Rules."); <u>see also</u> ("Failure to comply with any of the
directions or obligations set forth in [the local rules], or
authorized by, the[] rules may result in dismissal, default, or
the imposition of other sanctions as deemed appropriate . . .

3.   Defendant's Obligation to Pay
Half of Plaintiff's Alleged Loan

Defendant argues that, because plaintiff has admitted his alleged loan of $134,113.53 was made to the 1210 Fire Rock partnership (rather than the LLC) before 2017, his claim for reimbursement of the funds he advanced to the 1210 Fire Rock partnership is barred by California's two-year statute of limitations.  (Docket Entry # 116-2, p. 10).  Plaintiff denies that the statute of limitations bars his reimbursement claim. (Docket Entry # 194-2, p. 6).  Plaintiff's reasoning is that: (1) his reimbursement claim began to accrue in August 2019 and, because he initiated this action on September 13, 2019 (Docket Entry # 1), he filed well within the two-year limitations period; and (2) his health issues incapacitated him and thereby tolled the statute of limitations.  See (Docket Entry # 194-2, pp. 6-7).

According to plaintiff, "[b]eginning in 2015 . . ., [defendant] consistently recognized that [plaintiff] had paid at least $110,000 more than his fifty-percent share of the expenses incurred in developing 1210 Fire Rock Loop and promised to pay him the amount necessary to balance their capital accounts . . . ."  (Docket Entry # 194-2, p. 2).  Plaintiff maintains that "his

_____

.").  This court instructs the parties to include citation to supporting authorities for their arguments in any briefs accompanying future motions.

cause of action against [defendant] accrued" as of August 2019, when "defendant told [plaintiff] he could not or would not pay his fifty percent share of" expenses.  (Docket Entry # 194-2, p. 3).  However, plaintiff does not cite to where in the record it demonstrates that defendant told plaintiff in August 2019 that he would not pay his share of expenses.  Furthermore, plaintiff's statement of facts does not reference any conversation between plaintiff and defendant in August 2019 in which defendant made plaintiff aware that he did not intend to pay his share of expenses.[27]  See generally (Docket Entry # 194-1).  Plaintiff's argument is therefore unavailing.

As defendant notes, plaintiff unequivocally testified that his loan of $90,764.06 (which he previously alleged, in the amended complaint, to be $134,113.53) was entirely to the 1210 Fire Rock Loop partnership, rather than the LLC.  See (Docket Entry # 118-5, p. 463) (plaintiff's testimony that, regarding the $90,764.06 loan, "[n]one of that [amount] was advanced to the LLC" but rather the 1210 Fire Rock Loop partnership).  Plaintiff also testified that the "bulk" of the 1210 Fire Rock

---

[27]  The closest statement to this effect in plaintiff's statement of facts is that, on July 29, 2019, defendant left a voicemail message for "admitt[ing] that he owed [plaintiff] about $55,000 for the 1210 [Fire Rock Loop] project but claimed that he could not make a lump sum payment and needed a payment plan."  (Docket Entry # 194-1, p. 59, ¶ 216); see (Docket Entry # 194-3, p. 32, ¶ 53).

Loop partnership's "expenses" "occurred in 2015" and that, throughout 2015 and 2016, he spoke with defendant about the need "to settle up."  (Docket Entry # 118-5, pp. 447, 450).  In his affidavit filed in support of his opposition, plaintiff indicates that he made loans to *both* the 1210 Fire Rock Loop partnership and LLC, but he does not provide the exact amounts. See (Docket Entry # 194-3, p. 26, ¶¶ 132-34).  Plaintiff's affidavit plainly contradicts his earlier deposition testimony. Compare (Docket Entry # 194-3, p. 26, ¶¶ 132-34), with (Docket Entry # 118-5, p. 463).  Furthermore, in plaintiff's opposition, he does not attempt to explain (let alone acknowledge) his earlier testimony that his loan was only to the LLC.  See generally (Docket Entry # 194-2).  For these reasons, this court agrees with defendant that any obligation defendant may have to reimburse plaintiff for his share of plaintiff's loan would fall under his obligations to the 1210 Fire Rock Loop partnership.[28]

---

[28] "Even if the sums had been 'loaned' to the LLC," defendant also argues, "none of the conditions that would trigger the payment of interest, costs and fees, claimed under Count II, was met" (i.e., a vote for majority approval to call upon Grunigen to contribute capital to the LLC) (Docket Entry # 116-2, p. 11). This argument relies on section 4.04(A) of the operating agreement, which provides: "in the event that . . . funds . . . in excess of available loan proceeds . . . are required to pay . . . expenditures of the [LLC] . . ., then upon [m]ajority [a]pproval of the [m]embers, each [m]ember shall contribute to the capital of the [LLC] . . . his proportionate share of such required additional funds." (Docket Entry # 119-2, p. 8, section 4.04(A)).  "Majority approval" is defined in the operating agreement as "the affirmative vote or consent of

See Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5
(1st Cir. 1994) ("When an interested witness has given clear
answers to unambiguous questions, he cannot create a conflict
and resist summary judgment with an affidavit that is clearly
contradictory, but does not give a satisfactory explanation of
why the testimony is changed."); accord Orta-Castro v. Merck,
Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105, 110 (1st Cir.
2006); see also Mahan v. Bos. Water & Sewer Comm'n, 179 F.R.D.
49, 53 (D. Mass. 1998) ("If a party simply could offer a
contradictory, post-deposition affidavit to defeat summary
judgment without providing a "satisfactory explanation" for the
contradiction, the purpose of summary judgment would be
defeated" (citation omitted)).

Under California law, the statute of limitations is "two
years for breach of an oral contract," such as the parties' oral

_____

[m]embers owning fifty-one (51%) of the total [p]ercentage of
[m]embership [i]nterest."  (Docket Entry # 119-2, p. 3).  Here,
it is undisputed that "[n]o vote for [m]ajority [a]pproval was
ever taken for a capital contribution call."  (Docket Entry #
117-1, p. 7, ¶ 39) (Docket Entry # 194-1, p. 9, ¶ 39).  This
court therefore agrees that, absent a "vote for [m]ajority
[a]pproval" pursuant to section 4.04(A), section 4.04(B) of the
operating agreement (the "default" provision) was not triggered.
See (Docket Entry # 119-2, p. 8, section 4.04(B)) (providing
that a member's failure to make a capital contribution call
required under section 4.40(A) constitutes a default entitling
the non-defaulting member to "the amounts advanced on such
[m]ember's behalf, together with interest thereon," and to sue
the defaulting member for the owed amounts).

agreement to form the 1210 Fire Rock Loop partnership.[29]  See
Zecos v. Nicholas-Applegate Cap. Mgmt., 42 F. App'x 31, 32 (9th
Cir. 2002); see also Cal. Code Civ. Proc. § 339; (Docket Entry #
117-1, p. 2, ¶ 19) (Docket Entry # 194-1, p. 5, ¶ 19) (Docket
Entry # 194-3, p. 18, ¶¶ 75-77).  "A cause of action for a breach
of an oral contract accrues at the time of the breach, i.e.,
when the party charged with the duty to perform under the
contract fails to perform."  Zecos, 42 F. App'x at 32; Vestis,
LLC v. Caramel Sales, Ltd., No. SACV182257DOCKESX, 2019 WL
3312212, at *6 (C.D. Cal. Apr. 30, 2019); see Romano v. Rockwell
Internat., Inc., 926 P.2d 1114, 1119 (Cal. 1996) (providing that
cause of action for breach of contract does not accrue until
"the time specified therein for performance has arrived"
(citation and internal quotation marks omitted)).  "[T]he rule
of delayed commencement provides that when a 'defendant,
obligated to perform over a period of time, is guilty of [a]
material breach, the plaintiff may waive it and stand on the
contract until the time for final performance,' and 'the statute
of limitations [does] not [] begin running until the date when

---

[29] Plaintiff has not alleged in Count II any "elements of fraud
such as would bring it within the purview of section 338
(subdivision 4), of the [California] Code of Civil Procedure,"
which provides for a three-year statute of limitations.  See
Davies v. Krasna, 535 P.2d 1161, 1165 (Cal. 1975) (citation and
internal quotation marks omitted); see also Cal. Code Civ. Proc.
§ 338.

the last performance is due.'" <u>Vahora v. Masood</u>, No. 1:16-CV-
1624-LJO-SKO, 2017 WL 1213423, at *8 (E.D. Cal. Apr. 3, 2017)
(brackets in original omitted) (quoting <u>Israelsky v. Title Ins.
Co.</u>, 261 Cal. Rptr. 72, 76 (Cal. Ct. App.), <u>as modified on
denial of reh'g</u> (June 20, 1989); <u>see also</u> <u>Romano</u>, 926 P.2d at
1120 ("In the context of successive breaches of a continuing
contractual obligation, . . . where the parties did not mutually
abandon or rescind it upon a breach or successive breaches, the
injured party could wait until the time arrived for a complete
performance by the other party and then bring an action for
damages for such breaches." (citation and internal quotation
marks omitted)); <u>Lambert v. Commonwealth Land Title Ins. Co.</u>,
811 P.2d 737, 740 (Cal. 1991) ("California courts have long
given the 'plaintiff, in cases where a continuing duty has been
breached, the option of filing suit when the time for complete
performance has passed.'" (citation omitted)).  "[T]he rule of
delayed commencement applies to [an] oral partnership agreement"
that is "an executory contract that require[s] future
performance from" the partners.  <u>Vahora</u>, 2017 WL 1213423, at *12
(holding "partnership agreement was an executory contract that
required future performance from [defendant] and [plaintiff]"
because defendant "was to run the day-to-day operations,
[plaintiff] was to assist in management, and both parties were
to share in profits").  Here, per the parties' agreement, they

had an ongoing duty to equally split the profits and expenses of the 1210 Fire Rock Loop partnership. See (Docket Entry # 117-1, p. 2, ¶¶ 17-19) (Docket Entry # 194-1, p. 5, ¶¶ 17-19) (Docket Entry # 194-3, p. 18, ¶¶ 75-77); see also (Docket Entry # 118-5, p. 109). Thus, "under the rule of delayed commencement," defendant's alleged breaches for failing to reimburse various amounts owed to plaintiff "did not begin to accrue until the time for final performance under the oral contract," which would be "the [1210 Fire Rock Loop] partnership's termination." See Vahora, 2017 WL 1213423, at *12 ("The rule of delayed commencement provides that the statute of limitations does not accrue until the time for complete performance (the partnership equivalent being the partnership's termination).").

It is unclear from the record, however, when the 1210 Fire Rock Loop partnership terminated, "i.e., when all of the pre-existing [1210 Fire Rock Loop] partnership contractual obligations at the time of dissolution expired or were resolved." See Vahora, 2017 WL 1213423, at *12 (emphasis omitted). According to plaintiff's statement of facts, "the [1210 Fire Rock Loop] [p]artnership was dissolved on December 20, 2016," the day before the parties executed deeds conveying to the LLC their individual interests to 1210 Fire Rock Loop. (Docket Entry # 194-1, pp. 52, 69, ¶¶ 175-76, 264). "'Dissolution, however, does not terminate [a] partnership[,]

which . . . continues until the winding up of partnership affairs is completed.'" Vahora, 2017 WL 1213423, at *10 (quoting King v. Stoddard, 104 Cal. Rptr. 903 (Cal. Ct. App. 1972) (internal quotation marks and citation omitted)); see Cal. Corp. Code § 16802(a) ("The partnership is terminated when the winding up of its business is completed."). Defendant does not address when the 1210 Fire Rock Loop partnership dissolved or terminated.

As noted previously, "[w]here, as here, a defendant moves for summary judgment on the basis of an affirmative defense – like the statute of limitations – the defendant bears the burden of proof and 'cannot attain summary judgment unless the evidence that he provides on that issue is conclusive.'" Ouellette, 977 F.3d at 135 (quoting Torres Vargas, 149 F.3d at 35 (1st Cir. 1998). Because defendant has failed to allege when the 1210 Fire Rock Loop partnership terminated (and therefore when the statute of limitations began to accrue), he has not met his burden of demonstrating that plaintiff's claim is time barred.[30] See Vahora, 2017 WL 1213423, at *12; Ouellette, 977 F.3d at 135;

---

[30] Even if the parties' agreement to enter into the 1210 Fire Rock Loop partnership was not a continuing one, defendant would still bear the burden of alleging when the 1210 Fire Rock Loop partnership terminated (which would be when plaintiff's cause of action for breach of the parties' oral agreement began to accrue). See Ouellette, 977 F.3d at 135 (explaining that "defendant bears the burden of proof" when bringing a statute of limitations defense); Vahora, 2017 WL 1213423, at *12.

see also Vestis, 2019 WL 3312212, at *6 ("Viewing the evidence
presented in the light most favorable to the non-moving party,
the breach of the oral contract with respect to the []
[p]urchase [a]greement is not barred by the two-year statute of
limitations."). Accordingly, this court does not also address
whether, assuming the two-year statute of limitations applies,
plaintiff's health problems tolled the statute of limitations.
See (Docket Entry # 194-2, p. 2) (citation omitted).

### 4.   Plaintiff's Failure to Allege Harm

According to defendant, plaintiff has failed to "allege
that he suffered any harm as a result of any of the actions or
inactions taken by [defendant]."[31]  (Docket Entry # 116-2, p.

---

[31] The only caselaw that defendant cites in support of this
argument is from this court, interpreting Massachusetts law.
See (Docket Entry # 116-2, pp. 8, 11) (citing Davis v. Dawson,
Inc., 15 F. Supp. 2d 64, 133 (D. Mass. 1998) ("Damages
constitute an essential element to [a] breach of contract
claim.").  However, plaintiff's breach of contract claim in
Count II arises under California law.  See (Docket Entry # 20-1,
pp. 42-44, ¶¶ 161-72); (Docket Entry # 119-2, p. 25, section
14.04).  Regardless, whether Count II arises under Massachusetts
or California law, the result is the same: damages are an
essential element to a claim for breach of contract.  See Agam
v. Gavra, 186 Cal. Rptr. 3d 295, 305 (Cal. Ct. App. 2015) ("'A
cause of action for damages for breach of contract is comprised
of the following elements: (1) the contract, (2) plaintiff's
performance or excuse for nonperformance, (3) defendant's
breach, and (4) the resulting damages to plaintiff.'" (citation
omitted)).  Additionally, plaintiff must show damages regardless
of whether his loan was to the LLC (in which case defendant's
alleged failure to pay his "fair share" would constitute a
breach of the operating agreement) or to the 1210 Fire Rock Loop
partnership (in which case defendant's alleged failure to pay
his "fair share" would constitute a breach of the parties' 1210

11).  Plaintiff maintains that this argument has "no merit" and that he needs the LLC's "books of account [prepared] in accordance with GAAP" and "a statement of [his capital account's] balance"[32] so that he can then "determine the amount of [his] damages" and whether "a portion of the loan he made to fund the 1210 [Fire Rock Loop] project in excess of his fifty-percent share was converted to a fifty percent membership interest in the LLC."  (Docket Entry # 194-2, p. 3).  Thus, plaintiff does not deny that he must show damages for his breach of contract claim but instead alleges that he is unable to calculate his damages at this time because of defendant's failure to fulfill his obligations under the operating agreement.

As defendant notes, the amended complaint does not explicitly allege that defendant's breach of the operating

---

Fire Rock Loop partnership agreement).
[32] Section 4.07 of the operating agreement provides as follows: "[t]he [LLC] shall establish and maintain a separate [c]apital [a]ccount for each [m]ember in accordance with standard accounting practices and the terms of [e]xhibit B [of the operating agreement]."  (Docket Entry # 119-2, p. 9, section 4.07).  "Exhibit B, [section] 2" of the operating agreement delineates, inter alia, how the LLC must "establish and maintain a separate [c]apital [a]ccount for each [m]ember . . . ." (Docket Entry # 119-2, pp. 30-31).  As noted previously, under section 6.02(c), defendant has an obligation as the LLC's managing member to, within 90 days of "the end of each fiscal year," furnish to plaintiff, inter alia, "a statement of the balance in [plaintiff's] capital account" and "financial statements of the [LLC] . . . prepared in accordance with GAAP." (Docket Entry # 119-2, p. 12, section 6.02(C)).

agreement caused plaintiff "damages." See (Docket Entry # 20-1, pp. 42-44, ¶¶ 161-72). The amended complaint does, however, allege that defendant has "failed to repay to [plaintiff] the amounts he advanced on the LLC's behalf to complete the 1210 Fire Rock Loop project, such that [defendant] is now personally indebted to [plaintiff] for the amounts advanced with interest thereon . . ., plus all costs and expenses of maintaining this action . . . ." (Docket Entry # 20-1, p. 44, ¶ 172).

This court finds that "[t]he summary judgment record contains sufficient evidence of damages." See LPP Mortg., Ltd. v. M/V Cape Ann, No. CV 02-10787-MBB, 2005 WL 8176142, at *10 (D. Mass. Jan. 20, 2005). The amended complaint alleges that plaintiff ultimately paid more than his share of the LLC's expenses because of defendant's failure to reimburse him. See (Docket Entry # 20-1, p. 44, ¶¶ 167-72). At his deposition, plaintiff testified that defendant failed to pay his proportionate share of the 1210 Fire Rock Loop partnership's expenses. (Docket Entry # 118-5, pp. 448-52, 459-60). In the affidavit he filed in support of his opposition, he affirmed that: he "contribut[ed] more than [his] fifty-percent share to the payment of [the 1210 Fire Rock Loop] partnership expenses" (Docket Entry # 194-3, p. 20, ¶ 88); "[f]rom October 2015 until August 2016, [defendant] did not contribute towards the payment of [the 1210 Fire Rock Loop] project expenses . . ., while

[plaintiff] continued . . . [to] make additional loans to the [1210 Fire Rock Loop] partnership to cover expenses . . . ." (Docket Entry # 194-3, pp. 20-21, ¶ 93); and that he loaned money to both the 1210 Fire Rock Loop partnership and LLC beyond his proportionate share (Docket Entry # 194-3, p. 71, 27, ¶ 134).  Thus, while plaintiff has been inconsistent as to whether his loans were to the 1210 Fire Rock Loop partnership or the LLC (or both), he has consistently alleged that he paid more than his "fair share" of expenses.  These allegations, coupled with this court's obligation to view the record in the light most favorable to plaintiff when adjudicating defendant's motion for summary judgment, leads this court to find that plaintiff has sufficiently alleged for Count II that he suffered financial harm.  See Garcia-Garcia, 878 F.3d at 417.

> 5.   The Operating Agreement's Provision
> on Dispute Resolution Provision

Defendant argues that plaintiff's "persistence in seeking more or different documentation from [defendant] is a matter which [plaintiff] agreed, under the terms of [section 6.04 of] the [o]perating [a]greement, to take up with an independent third party, as a condition precedent to litigation."[33]  (Docket

---

[33] The only case defendant cites in support of this argument is from the Ninth Circuit, interpreting Nevada law.  See (Docket Entry # 116, p. 10) (citing S.B. Corp. v. Hartford Acc. & Indem. Co., 100 F.3d 964 (9th Cir. 1996)).  As noted previously, Count II arises under California law, but this does not substantially

Entry # 116-2, p. 9); <u>see</u> (Docket Entry # 119-2, p. 13, section
6.04).  Plaintiff, in turn, maintains that the "dispute
resolution process set forth in [s]ection 6.04 . . . is only
triggered by a disagreement regarding the financial records of
the LLC," and therefore is not applicable here because "[t]he
financial records of the LLC are still incomplete and in draft
form."  (Docket Entry # 104-2, pp. 4-5).  Plaintiff insists that
"there are no financial records with which [he] can disagree"
"[u]ntil [defendant] complies with his obligation to prepare
full, true, complete, and accurate records and books of account
prepared in accordance with GAAP."  (Docket Entry # 194-2, p.
5).

    In support of his argument that the "books of account and
financial ledgers for the LLC exist only in draft form" and are
"incomplete on their face," plaintiff points to deposition

_____

change the analysis of the parties' obligations under section
6.04.  Under California law, "[a] condition precedent is either
an act of a party that must be performed or an uncertain event
that must happen before the contractual right accrues or the
contractual duty arises."  <u>Platt Pac., Inc. v. Andelson</u>, 862
P.2d 158, 162 (Cal. 1993); <u>see</u> <u>Orlando v. Carolina Cas. Ins.
Co.</u>, No. CIV F 07-0092AWISMS, 2007 WL 781598, at *4 (E.D. Cal.
Mar. 13, 2007); <u>Realmuto v. Gagnard</u>, 1 Cal. Rptr. 3d 569, 573
(Cal. Ct. App. 2003).  "The existence of a condition precedent
normally depends upon the intent of the parties as determined
from the words they have employed in the contract."  <u>Realmuto</u>, 1
Cal. Rptr. 3d at 573.  "If a condition precedent 'is not
fulfilled, the right to enforce the contract does not evolve.'"
<u>Orlando</u>, 2007 WL 781598, at *4 (quoting <u>Kadner v. Shields</u>, 97
Cal. Rptr. 742, 748 (Cal. Ct. App. 1971)).

testimony by defendant's accountant, Gerry Tulis ("Tulis").[34]
(Docket Entry # 194-2, p. 4).  Tulis testified that he prepared
draft "financials" for the LLC but had "no knowledge" as to
whether they had been completed or not.  (Docket Entry # 126-4,
p. 32).  He also indicated, however, that his "involvement" in,
and "work product" relating to, the LLC was "a draft, period,"
suggesting that he would not normally finalize the financials on
the LLC's behalf and that it was left to the LLC itself to do
so.  (Docket Entry # 126-4, p. 32); see also (Docket Entry #
126-4, pp. 30-31).  Although defendant insists that he "did
cause the LLC financials to be prepared and delivered," he does
not explicitly note whether he delivered the *final* financials.
See (Docket Entry # 116-2, p. 9, n. 1).

     Even assuming defendant did not finalize and deliver the

---

[34]  Plaintiff cites the entire deposition transcript of Tulis,
rather than a particular page (or particular quoted language)
therein.  See (Docket Entry # 194-2, p. 4); (Docket Entry # 126-
4) (Tulis's deposition testimony).  To the extent plaintiff
wishes to rely on deposition testimony in the future, this court
instructs him to use proper citations so that the court need not
unnecessarily sift through an entire 192-page deposition
transcript on his behalf.  See L.R. 56.1; Morales v. A.C.
Orssleff's EFTF, 246 F.3d 32, 35 (1st Cir. 2001) (noting that
plaintiff's "general reference to [deposition] testimony without
pinpointing where in th[e] 89-page deposition support for that
reference could be found . . . is precisely the situation that
Local Rule 311.12 [which is similar to L.R. 7.1(b) and 56.1]
seeks to avoid" and that parties ignore such rules "at their own
peril" (citation omitted)).  Furthermore, plaintiff alleges in
his opposition that Tulis prepared only draft financials, rather
than alleging as such in his L.R. 56.1 statement of facts.  See
generally (Docket Entry ## 194-1, 194-2).

LLC's final financials, this court is not convinced that "there are no financial records with which [plaintiff] can disagree" under section 6.04.  See (Docket Entry # 194-2, p. 5).  This court reiterates the clear language of section 6.04:

> [i]n the event of a disagreement regarding any financial records or any matter relating thereto . . ., upon written notice, the parties shall in good faith attempt to resolve such disagreement within fifteen (15) calendar days of . . . such notice.  If the parties cannot agree within such . . . period, such parties shall each submit their positions, together with the basis for such positions, to any mutually acceptable third party (or, if such parties cannot so agree, a 'Big 4' accounting firm that has not represented any of the parties to such disagreement within the prior two (2) year period) (the '[d]ispute [r]esolution [f]irm').  Such third party shall have thirty (30) calendar days to resolve such disagreement, choosing either the [m]anaging [m]ember's or the [n]on-[m]anaging [m]ember's basis for each position.  The [m]anaging [m]ember shall then revise the financial statements prepared, if necessary, to reflect the resolution of each disagreement.

(Docket Entry # 119-2, p. 13, section 6.04).  Plaintiff's claims that defendant failed to deliver the LLC's final financials (and in accordance with GAAP) and failed to timely file the LLC's tax returns clearly qualify as "disagreement[s] regarding" the LLC's "financial records or [] matter[s] related thereto."  See (Docket Entry # 119-2, p. 13, section 6.04).  The language of section 6.04 does not restrict the dispute resolution process to "draft" or "final" financial records, but simply "financial records."  See (Docket Entry # 119-2, p. 13, section 6.04).  A "draft" financial record is still a financial record.  See Coral

Farms, L.P. v. Mahony, 277 Cal. Rptr. 3d 872, 877 (Cal. Ct. App. 2021) ("In interpreting a contract, we give the words their ordinary and popular meaning, unless the parties or usage have given the words a specialized or technical meaning."); Cal. Code Civ. Proc. § 1644 ("The words of a contract are to be understood in their ordinary and popular sense . . . unless a [technical or] special meaning is given to them by [the parties or] usage."). Similarly, a tax return is a financial record and the filing of a tax return is a "matter related thereto," and therefore whether defendant timely filed the LLC's tax returns is "a disagreement regarding [] financial records." See (Docket Entry # 119-2, p. 13, section 6.04); see also Coral Farms, 277 Cal. Rptr. 3d at 877; Cal. Code Civ. Proc. § 1644.

However, this court does not find that plaintiff was required to engage in the dispute resolution procedure of section 6.04 prior to bringing Count II. When a contract requires that the parties engage in certain dispute resolution procedures before filing suit, the satisfaction of such procedures is a condition precedent to filing suit. See B & O Mfg., Inc. v. Home Depot U.S.A., Inc., No. C 07-02864 JSW, 2007 WL 3232276, at *8 (N.D. Cal. Nov. 1, 2007) (explaining that a requirement that the parties engage in mediation before filing suit "is a condition precedent to the parties' right to sue . . . ."). Thus, a plaintiff's failure to engage in those

procedures prior to filing suit warrants dismissal.  <u>See</u> <u>Brosnan</u>
<u>v. Dry Cleaning Station Inc.</u>, No. C-08-02028 EDL, 2008 WL
2388392, at *1 (N.D. Cal. June 6, 2008) ("Failure to mediate a
dispute pursuant to a contract that makes mediation a condition
precedent to filing a lawsuit warrants dismissal."); <u>see also</u>
<u>Centaur Corp. v. ON Semiconductor Components Indus., LLC</u>, No. 09
CV 2041 JM BLM, 2010 WL 444715, at *3 (S.D. Cal. Feb. 2, 2010);
<u>Delamater v. Anytime Fitness, Inc.</u>, 722 F. Supp. 2d 1168, 1180–
81 (E.D. Cal. 2010).

"To determine whether a contract makes mediation [or other
form of dispute resolution] a condition precedent to filing a
lawsuit, a court applies standard principles of contract
construction."  <u>Centaur</u>, 2010 WL 444715, at *3; <u>see</u> <u>Del Rey</u>
<u>Fuel, LLC v. Bellingham Marine Indus., Inc.</u>, No.
CV1201008MMMMANX, 2012 WL 12941956, at *5 (C.D. Cal. Apr. 10,
2012) ("California courts have determined that the existence of
an agreement to arbitrate should be determined through the
application of ordinary principles of contract law.").
"[P]rovisions of a contract will not be construed as conditions
precedent in the absence of language plainly requiring such
construction."  <u>Rubin v. Fuchs</u>, 459 P.2d 925, 928 (Cal. 1969);
<u>see</u> <u>Corbrus, LLC v. 8th Bridge Cap., Inc.</u>, No.
219CV10182CASAFMX, 2021 WL 2781811, at *13 (C.D. Cal. July 1,
2021); <u>Barroso v. Ocwen Loan Servicing, LLC</u>, 146 Cal. Rptr. 3d

90, 97 (Cal. Ct. App. 2012).  "When courts have found that mediation [or another form of dispute resolution] is a condition precedent to initiating litigation, the parties' agreement has both (i) addressed the issue of filing a lawsuit, and (ii) specified that mediation [or the other form of dispute resolution] must first take place . . . ."  Franke v. Yates, No. 19-CV-00007-DKW-RT, 2019 WL 4856002, at *6 (D. Haw. Oct. 1, 2019) (citing two cases applying California law); see, e.g.; Centaur, 2010 WL 444715, at *1-2 (finding mediation was condition precedent to lawsuit where parties agreed to mediate future disputes and, if mediation was unsuccessful, to "then [] submit[] [the dispute] to the courts within Arizona for resolution"); Brosnan, 2008 WL 2388392, at *1 (finding mediation was condition precedent to lawsuit where each party agreed "to enter into mediation of all disputes involving [their] [a]greement . . . prior to initiating any legal action against the other"); Delamater, 722 F. Supp. 2d at 1177 (where parties agreed that mediation was a condition precedent to filing suit because they had agreed "to enter into mediation of all disputes involving [the] [a]greement or any other aspect of [their] relationship . . . *prior to initiating any legal action* or arbitration against the other" (emphasis added)).

Here, section 6.04 does not indicate that the parties must first engage in the dispute resolution procedure delineated

therein before filing suit.  See (Docket Entry # 119-2, p. 13, section 6.04).  Plaintiff was therefore not required to first resort to section 6.04's dispute resolution procedure before bringing Count II against defendant.  See Rubin, 459 P.2d at 928 ("[P]rovisions of a contract will not be construed as conditions precedent in the absence of language plainly requiring such construction.").  Thus, "[w]hile [this] [c]ourt recognizes that the parties may have intended for some disputes to be handled through the dispute resolution process[] of [section 6.04], [this] [c]ourt does not agree with [defendant]'s assertion that a party's failure to submit its claims to the [section 6.04] dispute resolution procedure[] is an absolute bar to litigation."  Bombardier, 298 F. Supp. 2d at 4-5.

For the foregoing reasons, summary judgment as to Count II is inappropriate.  See Fed. R. Civ. P. 56(a).

C.    Count III: Violation of
      Section 17701.13(d)(7) of RULLCA

Count III alleges that defendant violated section 17701.13(d)(7) of RULLCA ("section 17701.13(d)") and "failed without justification to comply with the requirements of [s]ection 17704.10."  (Docket Entry # 20-1, pp. 45-46).

Section 17701.13(d) requires "[e]ach limited liability company [to] maintain," inter alia: "[c]opies of the . . . company's federal, state, and local income tax or information

returns and reports, if any, for the six most recent fiscal

years" (Cal. Corp. Code § 17701.13(d)(4)); and "[t]he books and

records of the . . . company as they relate to [its] internal

affairs . . . for at least the current and past four fiscal

years" (Cal. Corp. Code § 17701.13(d)(7)).

Section 17704.10 of RULLCA ("section 17704.10") governs a

limited liability company's obligation to provide its members,

upon request, certain information the company must maintain under

section 17701.13(d).  See Cal. Corp. Code §§ 17704.10(a), (b),

(e).  Section 17704.10(a), for example, provides as follows:

> [u]pon the request of a member . . ., for purposes
> reasonably related to the interest of that person as a
> member . . ., a manager . . . shall promptly deliver, in
> writing, to the member . . ., at the expense of the
> limited liability company, a copy of the information
> required to be maintained by paragraphs (1), (2), and (4)
> of subdivision (d) of [s]ection 17701.13, and any written
> operating agreement of the limited liability company.

Cal. Corp. Code § 17704.10(a).[35]  Section 17704.10(b) provides as

---

[35] Plaintiff interprets the language of section 17704.10(a) to
indicate that the "information required to be maintained" is
that "information required" by not only "paragraphs (1), (2), and
(4) of subdivision (d) of [s]ection 17701.13" *but also* that
"information required" by "any written operating agreement of the
limited liability company."  See Cal. Corp. Code § 17704.10(a);
(Docket Entry # 194-2, p. 1) ("Section 17704.10(a) of the
California Corporations Code provides, in pertinent part, that,
upon the request of a member of an LLC, 'for a purpose
reasonably related' to his interest as a member, the LLC manager
'shall promptly deliver, in writing, to the member . . . a copy
of the information required to be maintained by . . . any
operating agreement of the LLC.'" (alteration in original)).
Section 17704.10(a), however, can also be read as providing that
the manager: (1) must provide the "information required to be

follows:

> (b) Each member . . . has the right, upon reasonable request, for purposes reasonably related to the interest of that person as a member . . . to each of the following:

> (1) To inspect and copy during normal business hours any of the records required to be maintained pursuant to [s]ection 17701.13.

> (2) To obtain in writing from the limited liability company, promptly after becoming available, a copy of the limited liability company's federal, state, and local income tax returns for each year.

Cal. Corp. Code § 17704.10(b).  Finally, under section 17704.10(e), "a limited liability company with 35 or fewer members" has an obligation to send to its members "within 90 days after the end of each taxable year the information necessary to complete federal and state income tax or information returns and . . . a copy of the . . . company's federal, state, and local income tax or information returns for the year."  Cal. Corp. Code § 17704.10(e).

Defendant maintains that "[plaintiff] was provided all of the books and records that [defendant] had with regard to

---

maintained" by the first, second, and fourth paragraphs of section 17703.13; and (2) must provide a copy of the company's operating agreement.  See Cal. Corp. Code § 17704.10(a).  However, defendant does not dispute plaintiff's reading of the statue, and this court could not identify any authority clarifying which interpretation of section 17704.10(a) is correct.  As such, in evaluating defendant's motion for summary judgment, this court proceeds with plaintiff's reading of section 17704.10(a).  Under either interpretation, however, and for the reasons delineated below, defendant has failed to show that he is entitled to summary judgment on Count III.

the LLC, including the closing documents and tax returns . . .

." (Docket Entry # 116-2, p. 12).  He also reiterates that: (1)

"if [plaintiff] had any dispute about" whether defendant

provided all the necessary books and records, "[plaintiff] was

obligated, by contract, to take the matter up with a neutral

third party, rather than bring this matter to this [c]ourt for

resolution"; and (2) "[plaintiff] has failed to allege that any

of the acts taken, or not taken by [defendant] in regard to the

financial documents or tax returns, caused him damage." (Docket

Entry # 116-2, p. 12).

In his opposition, plaintiff does not cite, or address his

claim under, section 17701.13(d)(7).[36]  The heading for Count III

in the amended complaint indicates that Count III alleges a

violation of 177013(d)(7).  The body text of Count III, however,

cites and discusses section 17701.13(d)(7) and various

subsections of section 17704.10.  Thus, in substance, plaintiff

appears to allege a violation of both section 17701.13(d)(7) and

section 17704.10.  As noted above, these two sections are

interconnected, as section 17704.10 requires that a manager

provide to a member (upon request) certain information the LLC

must maintain under section 17701.13(d)(7).  For this reason,

---

[36] Plaintiff also does not cite or otherwise address section
17701.13(d)(7) in his brief supporting his motion for summary
judgment.  See (Docket Entry # 121).

this court does not consider plaintiff's claim for a violation
of section 17701.13(d)(7) waived at the summary judgment stage.
See Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st
Cir. 1995) ("[A]n issue raised in the complaint but ignored at
summary judgment may be deemed waived."); Montany v. Univ. of
New England, 858 F.3d 34, 41 (1st Cir. 2017) (agreeing that the
plaintiff's "failure to put forth any argument in her opposition
to defendants' motion for summary judgment to the effect that
[one of the defendants] breached a provision of the student
handbook constitute[d] abandonment of any such claim").  This
court also arrives at this conclusion because defendant did not
argue in his reply that plaintiff has waived or otherwise
abandoned his claim for violation of section 17701.13.(d)(7).[37]

Plaintiff maintains that there are genuine issues of
material fact as to whether defendant complied with section
17704.10 but also argues that "[t]he record establishes
peradventure that [defendant] has failed to":

> (1) [] create or . . . maintain[] books of account for
> the LLC in accordance with GAAP [as required by the
> operating agreement] ; (2) furnish [plaintiff] an annual
> report of the LLC, including a year-end balance; a profit
> and loss statement; a statement of the balance in
> [plaintiff]'s capital account; and the amount of
> [plaintiff]'s share of the LLC's income, gain, losses,
> deductions and other relevant items for [f]ederal income
> tax purposes; and (3) furnish, within seventy-five days
> after the end of the LLC's fiscal year (2017), a copy of

---

[37] Defendant simply notes that plaintiff's "[o]pposition does not
address his claim under [s]ection 17701.13(d)(7)."

the LLC's information return.
(Docket Entry # 194-2, p. 2).  Additionally, plaintiff denies,
contrary to defendant's suggestion (Docket Entry # 116-2, p. 8),
"that the only information [he] needed to prepare his 2017 tax
returns was a K-1, and that a K-1 was provided on a timely
basis."  (Docket Entry # 194-2, p. 2).  He maintains that
neither he nor Branscome (his attorney-in-fact) "has ever been
supplied with a complete and accurate K-1" and that, because of
defendant's failure to provide "final, reconciled, and verified
books of account for the LLC or the annual report," plaintiff
would be "unable to determine [the] accuracy" of even a complete
K-1.  (Docket Entry # 194-2, pp. 2-3); see (Docket Entry # 122,
p. 9, ¶ 37).

     At the least, whether defendant allowed plaintiff access to
or provided "all of the books and records that [defendant] had
with regard to the LLC" is a genuine dispute of material fact
that precludes summary judgment as to Count III.  See (Docket
Entry # 117-1, p. 10, ¶ 61) (defendant alleging that he
"repeatedly provided whatever books and records he has for the
LLC to [plaintiff] . . . ."); (Docket Entry # 194-1, p. 12, ¶
61) (citing (Docket Entry # 194-1, p. 57, ¶ 204) (plaintiff
alleging that defendant "has thus far refused to provide final,
reconciled, verified and complete book of account for the LLC .
. . .")); (Docket Entry # 194-3, p. 28, # 141) (plaintiff

affirming that he has "not been provided true, accurate and complete books of account and records for the LLC . . . ."). "[A] rational factfinder could resolve" the issue of whether defendant sufficiently provided plaintiff with the LLC's books and records (as required by sections 17701.13(d)(7) and 17704.10) in either party's favor, and this issue is "'material'" because it "could change . . . [the] outcome" of Count III (which is based on defendant's alleged failure to provide the requisite books and records).  See Omni Hotels, 882 F.3d at 5; see also Scott, 550 U.S. at 380.  Furthermore, for the reasons set forth above as to Count II, this court disagrees that plaintiff was obligated to resort to the operating agreement's dispute resolution procedure before bringing Count III.  Defendant also fails to explain or otherwise show why plaintiff must demonstrate harm to sufficiently plead a violation of section 17704.10 or section 17701.13(d).  For these reasons, summary judgment as to Count III is also inappropriate.

> D.   Count V: Violation of Section 16404 of RUPA

Count V alleges that defendant breached: (1) his "duty of loyalty to the [1610 Fire Rock Loop] [p]artnership" and plaintiff under section 16404(a) of RUPA ("section 16404(a)") "by, among other things, dealing with the [1610 Fire Rock Loop] [p]artnership in the conduct of the [1610 Fire Rock Loop] [p]artnership on or [sic] behalf of parties having an interest

adverse to the [1610 Fire Rock Loop] [p]artnership, including but
not limited to Logan and the Barrosos"; and (2) "his duty of care
and obligation of good faith and fair dealing to" plaintiff, as
his partner, under section 16404(d) of RUPA ("section 16404(d)").
(Docket Entry # 20-1, pp. 47-48, ¶¶ 189-94).

Under section 16404(a), a partner "owes to the partnership
and the other partners" the fiduciary duties of loyalty and
care.  Cal. Corp. Code § 16404(a).  "A partner's duty of
loyalty" includes "refrain[ing] from dealing with the
partnership in the conduct or winding up of the partnership
business as or on behalf of a party having an interest adverse
to the partnership."  Cal. Corp. Code § 16404(a).  "A partner's
duty of care 'is limited to refraining from engaging in grossly
negligent or reckless conduct, intentional misconduct, or a
knowing violation of the law.'"[38]  t'Bear, 359 F. Supp. 3d at 900
(quoting Cal. Corp. Code § 16404(c)).  Section 16404 also
requires a partner to "discharge the duties to the partnership

---

[38] In alleging gross negligence, a plaintiff "must prove that
[the] defendant's actions constituted a complete lack of due
care "'or an extreme departure from the ordinary standard of
conduct.'"  t'Bear v. Forman, 359 F. Supp. 3d 882, 900 (N.D.
Cal. 2019) (quoting Rosencrans v. Dover Images, Ltd., 122 Cal.
Rptr. 3d 22, 31 (Cal. Ct. App. 2011) (internal quotations and
citations omitted)).  Reckless conduct "involves more than
'inadvertence, incompetence, unskillfulness, or a failure to
take precautions'" and is demonstrated by a "'conscious choice
of a course of action . . . with knowledge of the serious danger
to others involved in it.'"  Delaney v. Baker, 971 P.2d 986
(Cal. 1999) (citation omitted).

and the other partners . . . with the obligation of good faith and fair dealing."  Cal. Corp. Code § 16404(d).

In moving for summary judgment as to Count V, defendant highlights portions of plaintiff's deposition testimony.  See (Docket Entry # 116-2, pp. 14-15).  Defendant first notes that, when plaintiff was asked whether he "believe[d] that [defendant] ever did anything in connection with 1610 that he did not reasonably believe was in the best interest of that partnership," he answered that he could not "make an assessment on [] [defendant's] thought process" and that he did not "know the relationships between [defendant] and other people, so . . . [plaintiff was] still at a loss of information."  (Docket Entry # 116-2, p. 14) (internal quotations omitted) (quoting (Docket Entry # 185-5, p. 167)).  Defendant's counsel then asked whether plaintiff had "any basis on which to believe that [defendant] ever did anything in connection with 1610 that he didn't think was good for 1610," and plaintiff responded that he did not know. (Docket Entry # 116-2, p. 15) (internal quotations omitted) (quoting (Docket Entry # 185-5, p. 167)).  Second, defendant notes that, when plaintiff was asked why he "defer[red] to" defendant, he testified that he did so because defendant is "an architect and [] the owner" of 1610 Fire Rock Loop and was "out in the field," whereas plaintiff was "in a compromised position of control" because he was "sitting in an office 300 miles away."

(Docket Entry # 116-2, p. 15) (internal quotations omitted) (quoting (Docket Entry # 185-5, p. 166)).  Third, in explaining why he deferred to defendant when defendant "wanted to pay something that [plaintiff] thought . . . was either too much or not needed," plaintiff testified that he "took what [defendant]" told him "as truth and fact" and that he had "no reason not to doubt [defendant's] fiduciary commitment or loyalty to [plaintiff] in authorizing those payments."  (Docket Entry # 185-5, p. 71); see (Docket Entry # 116-2, p. 15).

Defendant then argues that, "[t]o the extent that the settlement payment [to the Barrosos] could form the basis for a claim under Count VI [sic], the undisputed facts do not support such a claim."  (Docket Entry # 116-2, p. 15).  He points to plaintiff's "extensive[]" testimony that, "in 2017, [plaintiff] participated in a review of the settlement terms with his attorney."  (Docket Entry # 116-2, p. 15); see, e.g., (Docket Entry # 118-5) (plaintiff's testimony that he approved the settlement agreement but did so while medicated).  Defendant takes issue with the fact that plaintiff:

> now claims that[,] in January 2017, he took the position that settlement could only go forward if there was a 'third party independent evaluation' of the doors that were causing the warranty issue, [but] also claims . . . he took that position . . . [while] 'medicated,' 'on antipsychotics and Trazodone' and that, at this time, he had already placed business decisions for the 1610 [Fire Rock Loop] [p]artnership 'in [defendant] and counsel's hands' . . . .

65

(Docket Entry # 116-2, pp. 15-16) (brackets and citations omitted).  Defendant then notes: "[u]ltimately, having had the doors examined and repaired numerous times, including by independent evaluators, [defendant] accepted the advice of counsel, in the face of a threat of suit, and settled with the [Barrosos] for $55,000.00."  (Docket Entry # 116-2, p. 16).

Based on the foregoing, defendant appears to argue that he did not violate any duties of care any loyalty to the 1610 Fire Rock Loop partnership or plaintiff because he properly relied on the advice of counsel in deciding to settle – on behalf of the 1610 Fire Rock Loop partnership and plaintiff – with the Barrosos for $55,000.  Defendant, however, fails to cite a single case or other legal authority to support his argument that his conduct did not violate his duties to the 1610 Fire Rock partnership and plaintiff under section 16404.

Plaintiff, in turn, opposes summary judgment as to Count V on the basis that:

> [t]he record [] is chock full of evidence from which a
> trier of fact could reasonably find that [defendant]
> violated his fiduciary duties to [plaintiff], from his
> broken promises to provide backup for the advances and
> reimbursements he requested [plaintiff] to pay in the
> April 2014 to August 2014 time period on 1610 [Fire Rock
> Loop], to ignoring clearcut evidence that the door and
> window leaks the Barrosos experienced were the result of
> Logan's improper installation and/or as a result of the
> Barrosos' alteration of the grade at the rear of the
> house, to misrepresenting to [plaintiff] that a third-
> party inspection had absolved Logan and the Barrosos of
> any liability for the door leaks and found him liable

> under [the] [] warranty, when no neutral third-party
> inspection was ever conducted, to his unauthorized use
> of [plaintiff]'s ADLI trust funds to pay his share of
> the LLC's legal expenses.

(Docket Entry # 194-2, p. 8) (citations omitted).  Plaintiff

also argues that "the business judgment rule" (which he

interprets defendant as citing) does not "insulate [defendant]'s

conduct" because "the common law business judgment rule,

'strictly speaking' does not protect '[]noncorporate entities'

such as oral partnerships."  (Docket Entry # 194-2, p. 8)

(quoting Lamden v. La Jolla Shores Clubdominium Homeowners

Assn., 980 P.2d 940 (Cal. 1999) ("[N]either the California

statute nor the common law business judgment rule, strictly

speaking, protects noncorporate entities . . . .")).  However,

plaintiff continues, even if the business judgment rule did

apply, the protective presumption it creates for defendant

"would be rebutted [] by the overwhelming evidence establishing

fraud, bad faith, overreaching and his unreasonable failure to

investigate the Barroso's [sic] claim."  (Docket Entry # 194-2,

pp. 8-9) (citing Lee v. Interinsurance Exch., 57 Cal. Rptr. 2d

798, 811 (Cal. Ct. App. 1996)).

     In his reply, defendant responds that plaintiff fails to not

only "address the legal authority cited by" defendant in his

motion for summary judgment but also "cite a single example of a

time [defendant] ever promoted interests adverse to that of the .

. . 1610 Fire Rock [Loop] [p]artnership." (Docket Entry # 192, p. 7). Ironically, however, defendant does not address plaintiff's argument that the business judgment rule does not apply here, nor does he cite any case or other legal authority in his reply to support his argument that his conduct did not violate section 16404. See generally (Docket Entry # 192, pp. 7-8).

This court therefore concludes that whether defendant's conduct constituted a violation of his duties under section 16404 is a genuine issue of material fact that is not appropriate for summary judgment. See Fed. R. Civ. P. 56(a); Pierce, 741 F.3d at 301. Construing the record in plaintiff's favor, this court finds that a rational factfinder could conclude that defendant's conduct constituted a violation of his duties under section 16404 of RUPA. See Omni Hotels, 882 F.3d at 5; Pierce, 741 F.3d at 301.

 E. Count VI: Fraud in Violation of California Common Law

Count VI alleges that defendant, with "malice and oppression" (Docket Entry # 20-1, p. 50, ¶ 201), committed common law fraud by:

> intentionally (a) conceal[ing] material facts from [plaintiff] relating to the LLC's expenses in constructing 1210 Fire Rock Loop and the [1610] Fire Rock Loop [p]artnership's expenses in constructing 1610 Fire Rock Loop; and (b) affirmatively misrepresented material facts concerning the status, progress, expenses, profits and/or losses in 1210 Fire Rock Loop and . . . 1610 Fire Rock Loop.

(Docket Entry # 20-1, p. 48, ¶ 196).  Plaintiff alleges that he "justifiably relied on [defendant]'s fraudulent [and material] misrepresentations and non-disclosures/omissions" based on defendant's "expertise" in the industry and "superior knowledge" of the projects.  (Docket Entry # 20-1, p. 49, ¶ 197); <u>see</u> (Docket Entry # 20-1, p. 49, ¶ 199).  According to plaintiff, defendant "made such affirmative misrepresentations" knowing "them to be false" and "with the specific intent of harming [plaintiff] by causing him to advance monies to and make payments on behalf of the LLC and 1210 Fire Rock [Loop] [p]artnership . . . when he had no intention of contributing his one-half share."  (Docket Entry # 20-1, p. 49, ¶ 198). Plaintiff further alleges that: he was "ignorant of the falsity of [defendant]'s representations[]"; "could not, in the exercise of reasonable diligence, have discovered [defendant]'s" material non-disclosures; and relied "on [defendant]'s affirmative misrepresentations and material omissions/concealments" by "continu[ing] to advance substantial funds to complete 1210 Fire Rock Loop and was further induced to refrain from discovering and investigating the actual circumstances surrounding his investments."  (Docket Entry # 20-1, p. 49, ¶ 199).  Finally, plaintiff maintains that defendant's "fraud and deceit" proximately caused him financial harm.  (Docket Entry # 20-1, pp. 49-50, ¶¶ 199, 200).

Defendant moves for summary judgment as to Count VI on the basis that "the [a]mended [c]omplaint fails to satisfy the [particularity] requirements of Fed. R. Civ. 9(b) . . . ." ("Rule 9(b)")[39] (Docket Entry # 116-2, p. 17).  More specifically, he argues that, under Rule 9(b), "[i]t is inadequate to aver knowledge generally unless there are also other facts in the complaint 'that make it reasonable to believe that defendant knew that a statement was materially false or misleading.'"  (Docket Entry # 116-2, pp. 17-18) (quoting <u>N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale</u>, 567 F.3d 8, 13 (1st Cir. 2009) (citation and internal quotation marks omitted)).

In response, plaintiff maintains that the record sufficiently establishes both ordinary and constructive fraud.[40] (Docket Entry # 194-2, pp. 10-11).  According to plaintiff, defendant's "experience as an architect performing takeoffs from construction plans and his ability to quickly perform such takeoffs through the use of his CAD system . . . supports an inference that he had actual knowledge that the quantities specified on the quotes [for the projects' materials and

---

[39] Rule 9(b) provides that, "[i]n alleging fraud . . ., a party must state with particularity the circumstances constituting fraud . . . ."  Fed. R. Civ. P. 9(b).
[40] Count VI in the amended complaint alleges only ordinary fraud. <u>See</u> (Docket Entry # 20-1, pp. 48-50, ¶¶ 195-201).

services] were vastly overstated."  (Docket Entry # 194-2, p. 10) (citation omitted).  Plaintiff further maintains that the record, along with defendant's "failure, despite his repeated promises, to [] furnish the promised backup for the advanced and reimbursements [] requested," supports "the . . . inference . . . that [defendant] intended to defraud the 1610 [Fire Rock Loop] partnership . . . ."  (Docket Entry # 194-2, pp. 10-11). Finally, plaintiff argues that he has sufficiently established a claim for constructive fraud because: "[a] fiduciary relationship existed between" him and defendant (as partners) that obligated defendant "to disclose the fact that excess quantities" of construction materials were being ordered; and the "record . . . support[s] an inference that [defendant] gained an advantage over [plaintiff] by misleading him, to his prejudice, into paying advances or reimbursements . . . with empty promises that the backup documentation would be provided." (Docket Entry # 194-2, pp. 10-11).

"The elements of a cause of action for fraud in California are: '(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or '"scienter"'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'"[41]  Kearns v. Ford Motor

---

[41] "A fraudulent state of mind includes not only knowledge of falsity of the misrepresentation but also an intent to . . .

<u>Co.</u>, 567 F.3d 1120, 1126 (9th Cir. 2009) (emphasis omitted) (quoting <u>Engalla v. Permanente Med. Grp., Inc.</u>, 938 P.2d 903, 917 (Cal.), <u>as modified</u> (Cal. July 30, 1997) (internal quotation marks and citations omitted)); <u>see</u> <u>Ragland v. U.S. Bank Nat'l Assn.</u>, 147 Cal. Rptr. 3d 41, 56 (Cal. Ct. App. 2012).  Whether a defendant made "(1) misrepresentations that (2) were made with scienter and (3) the intent to defraud" are generally questions of fact.  See <u>Erhart v. BofI Holding, Inc.</u>, No. 15-CV-02287-BAS-NLS, 2020 WL 1550207, at *42 (S.D. Cal. Mar. 31, 2020); <u>see also</u> <u>Intrieri v. Superior Ct.</u>, 12 Cal. Rptr. 3d 97, 109 (Cal. Ct. App. 2004) ("Whether [a party's] statements were false is a triable question of material fact . . . ."); <u>Pub. Emps.' Ret. Sys. v. Moody's Invs. Serv., Inc.</u>, 172 Cal. Rptr. 3d 238, 258 (Cal Ct. App. 2014) ("Intent to induce reliance is usually a 'question of fact' for the jury."); <u>Locke v. Warner Bros.</u>, 66 Cal. Rptr. 2d 921, 928 (Cal. Ct. App. 1997) ("[T]he issue of fraudulent intent is one for the trier of fact."); <u>Buist v. C. Dudley De Velbiss Corp.</u>, 6 Cal. Rptr. 259, 264 (Cal. Ct. App. 1960) ("Knowledge of the party charged with concealment and the materiality of the concealment are both questions of fact.").  Whether a plaintiff's reliance was reasonable is also generally

---

induce reliance on it."  <u>Beckwith v. Dahl</u>, 141 Cal. Rptr. 3d 142, 161 (Cal. Ct. App. 2012) (citations and internal quotation marks omitted).

a question of fact.  See OCM Principal Opportunities Fund, L.P.
v. CIBC World Mkts. Corp., 68 Cal. Rptr. 3d 828, 856 (Cal.), as
modified (Cal. Dec. 26, 2007) ("Except in the rare case where
the undisputed facts leave no room for a reasonable difference
of opinion, the question of whether a plaintiff's reliance is
reasonable is a question of fact." (citations and internal
quotation marks omitted)).  To show constructive fraud, a
plaintiff must allege "(1) a fiduciary relationship, (2)
nondisclosure, (3) intent to deceive, and (4) reliance and
resulting injury."  Tindell v. Murphy, 232 Cal. Rptr. 3d 448,
456 (Cal. Ct. App. 2018).

Although "[f]ederal courts apply state law to determine
whether the elements of fraud have been pleaded adequately to
state a cause of action, [] Rule 9(b) requires that the
circumstances establishing fraud must be stated with sufficient
particularity."  Amazing Ins., Inc. v. DiManno, No.
219CV01349TLNCKD, 2021 WL 5234736, at *7 (E.D. Cal. Nov. 10,
2021); see Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103
(9th Cir. 2003) ("'[W]hile a federal court will examine state
law to determine whether the elements of fraud have been pled
sufficiently to state a cause of action, the Rule 9(b)
requirement that the circumstances of the fraud must be stated
with particularity is a federally imposed rule.'" (citation
omitted)).  "Like an action for fraud, constructive fraud must

73

be pled with specificity." Tindell, 232 Cal. Rptr. 3d at 456.
"Rule 9(b)'s particularity standard requires 'an account of the
time, place, and specific content of the false representation,
as well as the [identities] of the parties to the
misrepresentation.'" Vestis, 2019 WL 3312212, at *11 (quoting
Swartz v. KPMG, 476 F.3d 756, 763 (9th Cir. 2007)); Fed. R. Civ.
P. 9(b). "Malice, intent, knowledge, and other conditions of a
person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Here, plaintiff pleads the necessary elements of fraud, but
the issue on summary judgment is whether he did so in compliance
with Rule 9(b)'s particularly requirements. As defendant notes,
"a complaint's general averment of the defendant's 'knowledge'
of material falsity" is inadequate "unless the complaint also
sets forth specific facts that make it reasonable to believe
that defendant knew that a statement was materially false or
misleading." Cardinale, 567 F.3d at 12. Viewing the record in
plaintiff's favor, this court concludes that the amended
complaint sets forth such facts.

Although defendant maintains that plaintiff has conceded
that certain allegations in the amended complaint are inaccurate
(or that plaintiff was otherwise mistaken as to certain project
quotes) (Docket Entry # 116, p. 17), there are other allegations
that support a claim for fraud against defendant. For instance,
the amended complaint alleges that: in March 2014, "in a

departure from the [1610 Fire Rock Loop] [p]artnership's typical
. . . practices, and . . . when . . . [plaintiff] was dealing
with the final illness of a close family member, [] [defendant]
and Logan represented to [plaintiff] that they intended to
purchase approximately 3,000 square feet of driveway pavers for
1610 Fire Rock Loop"; to avoid a scheduled price increase to
each square foot of the pavers, "[defendant] asked [plaintiff]
to quickly cut him a check for $9,501.00 so that he could
purchase the pavers at the lower price"; plaintiff cut a check
to defendant personally "[b]ased on that representation";
"[defendant] subsequently allocated the original 3,000 square
feet of pavers for use at the 1210 Fire Rock Loop project, but
failed to request reimbursement from Barrosos for the time and
overhead costs incurred . . . in making the switch"; "[o]n
August 2014, [d]efendant sent [plaintiff] a quote for an
additional $1,168.27 for 445 square feet of pavers that he
represented Logan had paid for the pavers for the driveway
ribbon for 1610 Fire Rock [Loop], which was only 80 square feet
in size"; "[i]n total, [plaintiff] advanced $4,668.27 to Logan,
at [defendant]'s direction, for 1,143 square feet of pavers for
which, as it turned out, Logan only paid $2,428.81"; and
"[d]espite [plaintiff's] repeated requests . . ., [defendant]
and Logan have refused to furnish final invoices and proof of
payment for the $4,668.27 [plaintiff] advanced for the 1,588

square feet of pavers." (Docket Entry # 20-1, pp. 8-9, ¶¶ 32-
39). Based on allegations such as these, this court disagrees
that "the evidence adduced to date has fully vindicated
[defendant] with respect to the few allegations that could
possibly support [plaintiff]'s claim of fraud." See (Docket
Entry # 116, p. 17).

This court also concludes that there are material questions
of fact barring summary judgment on Count VI, such as whether
defendant knew "that the quantities specified on the quotes [for
the projects' materials and services] were vastly overstated"
and/or "intended to defraud the 1610 [Fire Rock Loop]
partnership . . . ." (Docket Entry # 194-2, pp. 10-11); see
Fed. R. Civ. P. 56(a); Erhart, 2020 WL 1550207, at *42; Moody's,
172 Cal. Rptr. 3d at 258; Intrieri, 12 Cal. Rptr. 3d at 109.
Because this court finds that "a rational factfinder [could]
resolve [these] material factual dispute[s] in favor of either
side," summary judgment is inappropriate on Count VI. See
Pierce, 741 F.3d at 301.

    F.   Defendant's Counterclaims

The amended answer alleges two counterclaims for breach of
contract and setoff. (Docket Entry # 29). The breach of
contract counterclaim arises from the $55,000 settlement payment
to the Barrosos that "[defendant] expended . . . in connection
with the [1610 Fire Rock Loop] [p]roject, over and above that

contributed by [plaintiff]," despite the parties' agreement to
"split evenly expenses incurred . . . from the [1610 Fire Rock
Loop] [p]roject."  (Docket Entry # 29, p. 29, ¶¶ 5, 9).
Defendant "seeks to recover $27,500.00 from [plaintiff] for his
proportionate share of [the] $55,000.00 settlement . . . ."
(Docket Entry # 116-2, p. 19).  As for the setoff counterclaim,
"[t]o the extent that this [c]ourt determines that there is any
amount due and owing by [defendant] to [plaintiff], [defendant]
requests that this [c]ourt order and permit a setoff or
recoupment in favor of [defendant] in reduction of such amount."
(Docket Entry # 29, p. 29, ¶ 12).

        In moving for summary judgment on his counterclaims,
defendant argues that: (1) it is undisputed that the parties
agreed to equally split the expenses for 1610 Fire Rock Loop and
that defendant paid the Barrosos $55,000 in a settlement "on the
advice of counsel"; and (2) it is "apparent" that "[plaintiff]
agreed to give [defendant] full control of the business affairs
of the 1610 [Fire Rock Loop] [p]artnership when he was in the
midst of a mental break."  (Docket Entry # 116-2, pp. 19-20).
Once again, however, defendant does not cite any caselaw or
other legal authority in support of his argument that plaintiff
committed a breach of contract entitling defendant to summary

judgment on his counterclaims.[42]

Plaintiff denies that he owes defendant half of the $55,000 settlement sum.  He argues that defendant "failed to meet any of the conditions that [plaintiff] told him needed to be satisfied in order for [plaintiff] to consider a warranty claim for the doors" and that defendant "ignored the recommendations" of plaintiff and others to "call in a third-party neutral to conduct an inspection" of the Barrosos' doors.  (Docket Entry # 194-2, pp. 12-13).  He further argues that defendant:

> failed to even consider making a claim against Logan's insurance policy on which he was a named additional insured or suggest to the Barrosos that their alteration of the grading at the rear of the house voided his warranty[;] . . . told [plaintiff] that the Barrosos were going to sue them both when he knew, as Francisco Barroso testified at his deposition, that the only one he was holding responsible for the door leak was him[;] . . . paid in settlement a sum several times more than the original cost of the doors and windows, . . . supposedly . . . on a recommendation that DiMonte could not recall . . . giving and [] nowhere reflected in ADLI's bills[;] and, when [plaintiff]'s friend and attorney-in-fact had the unmitigated gall to demand that he provide evidence to support his claim that [plaintiff] owed half of the settlement amount, simply refused to provide it and wanted to know when he could pick up a check.

(Docket Entry # 194-2, p. 13).  In his statement of additional facts, which defendant highlights for this court, plaintiff alleges that "there is no evidence in the record to support the

---

[42] Nor does he even specify the elements of a breach of contract claim under California law.

payment by [defendant] of the sum of $55,000.00 to the Barrosos
. . . ." (Docket Entry # 194-1, p. 30, ¶ 71). Defendant, in
turn, maintains that "there is ample evidence of that payment in
the record" (Docket Entry # 192, p. 9), pointing to plaintiff's
allegation in the amended complaint that "[defendant] claimed .
. . that he had made a $55,000 payment via wire transfer to the
Barrosos" (Docket Entry # 20-1, p. 21, ¶ 85). Plaintiff also
noted in the amended complaint that it was not until July 2019
that defendant finally "provide[d] purported documentation" of
the settlement sum and that the documentation was "facially
incomplete and appeared to violate federal law in that it lacked
address information for the recipient of the purported wire."
(Docket Entry # 20-1, p. 21, ¶ 85).

Thus, while the record suggests that defendant did in fact
pay $55,000 to the Barrosos, the parties dispute whether
plaintiff was obligated, based on the parties' agreement to
evenly split expenses, to pay half of that sum. It is
undisputed that the parties agreed to split the 1610 Fire Rock
Loop partnership's expenses equally. See (Docket Entry # 117-1,
p. 2, ¶ 7) (Docket Entry # 194-1, p. 2, ¶ 7). As noted
previously, plaintiff maintains that he conditioned his
agreement "to move forward" with the settlement on defendant's
full disclosure to him of "all the relevant circumstances" of
the settlement and provision of "all backup" documentation as to

the settlement and underlying repair issue.  (Docket Entry #
194-3, p. 15, ¶ 61).  According to plaintiff, defendant never
satisfied those conditions.  (Docket Entry # 194-3, p. 15, ¶
64).  For example, plaintiff alleges, defendant did not disclose
at the time "that the Barrosos had never threatened to sue
[plaintiff], [and] only threatened to sue [defendant] . . . ."
(Docket Entry # 194-3, p. 14, ¶ 58).

    However, the parties had already agreed to equally split
the 1610 Fire Rock Loop partnership's expenses long before June
2016, which is when plaintiff alleges that defendant told him
about the impending settlement with the Barrosos and plaintiff
made clear to defendant that he would only agree to the
settlement on certain conditions.  See (Docket Entry # 194-3, p.
14, ¶ 57).  This raises of the issue as to whether, *at the time
the parties agreed to split the 1610 Fire Rock Loop
partnership's expenses equally*, they agreed to certain
conditions or limitations as to when each would be expected to
pay half of the expenses.  Neither party alleges that they did
so.  Separately, plaintiff's allegation that "that the Barrosos
had never threatened to sue [him], [and] only threatened to sue
[defendant]" (Docket Entry # 194-3, p. 14, ¶ 58) raises the
issue as to whether the settlement sum was in fact an expense of
the 1610 Fire Rock Loop partnership or rather a personal expense
of defendant that he characterized as belonging to the 1610 Fire

Rock Loop partnership.  Had it been the latter, plaintiff may

not have been obligated to pay half of the settlement.

Defendant maintains that the Barrosos threatened to sue *both* him

and Taylor.  (Docket Entry # 117-1, p. 9, ¶ 55) (Docket Entry #

119-1, p. 4, ¶ 22).  There is therefore a genuine dispute of

material fact as to whether the Barrosos threatened to sue

defendant or both parties.  Because defendant has failed to meet

his burden of "demonstrat[ing] the absence of any genuine issue

of material fact," summary judgment on his counterclaims is

inappropriate.  See Borges, 605 F.3d at 5; Pierce, 741 F.3d at

301.

II.  Plaintiff's Partial Motion for
     Summary Judgment (Docket Entry # 120)[43]

FACTUAL BACKGROUND

    In addition to the facts set out in the previous factual

background,[44] which are construed in defendant's favor for

purposes of adjudicating plaintiff's motion for partial summary

judgment (Docket Entry # 120), the facts include the following.

---

[43] Plaintiff filed two copies of the same memorandum supporting
his motion for summary judgment.  See (Docket Entry ## 121,
128).  This court will refer to the earlier filing (Docket Entry
# 121).  Plaintiff also filed two copies of his affidavit
supporting his motion for summary judgment.  See (Docket Entry
## 122, 123).  This court will again refer to the earlier filing
(Docket Entry # 122).
[44] As noted previously, this court may examine all of the record
materials on file even when not cited by the parties.  See
Geshke, 740 F.3d at 77; Fed. R. Civ. P. 56(c)(3).

"Beginning in August 2016, Grunigen took over the management of the [1210 Fire Rock Loop] partnership due to Taylor's health problems."  (Docket Entry # 120-1, p. 2, ¶ 2); see (Docket Entry # 136, p. 2, ¶ 2).  "On December 15, 2016, DiMonte caused [a]rticles of [o]rganization ('[a]rticles') for" the LLC, which "erroneously stated that the LLC had more than one manager," "to be filed with the California Secretary of State."  (Docket Entry # 120-1, p. 2, ¶ 4); see (Docket Entry # 136, p. 3, ¶ 4).  The articles and other inaccurate filings by Dimonte and Grunigen with the California Secretary of State "represent that Taylor was a member manager of the LLC with Grunigen from December 15, 2016 until February 21, 2017, a time when Grunigen was the sole member of the LLC."  (Docket Entry # 120-1, p. 6, ¶ 16); see (Docket Entry # 136, p. 5, ¶ 16).

Taylor and his attorney have repeatedly requested that Grunigen and his attorney provide "copies of books of account for the LLC prepared in accordance with GAAP."  (Docket Entry # 120-1, p. 10, ¶ 32); see (Docket Entry # 136, p. 9, ¶ 32).  While Grunigen has provided Taylor with "whatever books and records [he has] for the LLC," he has not "provided them according to GAAP." (Docket Entry # 119-1, p. 4, ¶ 25); see (Docket Entry # 120-1, p. 10, ¶ 32) (Docket Entry # 136, p. 9, ¶ 32).  Taylor and his attorney have also requested, since 2019, that Grunigen "prepare and file all [f]ederal, [s]tate, and local income tax and

information returns for the LLC for all tax years in which it operated."  (Docket Entry # 120-1, p. 12, ¶ 40); see (Docket Entry # 136, p. 11, ¶ 40).  "Despite having filed personal tax returns for 2017 reporting a loss from the LLC, it was not until October [20]21 that Grunigen furnished Taylor with copies of [the LLC's] tax returns for [] 2017 . . . which he represented he had filed with the Internal Revenue Service and the California Franchise Tax Board . . . ."  (Docket Entry # 120-1, pp. 12-13, ¶ 41); see (Docket Entry # 136, p. 11, ¶ 41).

DISCUSSION

Plaintiff moves "for partial summary judgment on [c]ounts I through III of" the amended complaint.  (Docket Entry # 120, p. 1).

A.   Count I: Violation of Section 17704.10(c) of RULLCA

Count I alleges violation of section 17704.10(c), which requires a manager of "a limited liability company with more than 35 members" to "cause an annual report to be sent to each of the members not later than 120 days after the close of the fiscal year," and such report must include "an income statement and a statement of cashflows for the fiscal year."  Cal. Corp. Code § 17704.10(c); see (Docket Entry # 20-1, pp. 41-42).  For the reasons set forth above – namely, that section 17704.10(c) applies only to limited liability companies with more than 35 members and it is undisputed here that the LLC is composed of

only two members – this court grants summary judgment on Count I in defendant's favor.

B.   Count II: Breach of the Operating Agreement

Count II alleges that defendant breached sections 4.04(A), 6.02(C), and 6.02(D) of the operating agreement.[45]  (Docket Entry # 20-1, pp. 42-44, ¶¶ 162-72).  Plaintiff argues that "[t]he record clearly establishes [defendant]'s failure to maintain full, true, complete and accurate records and books of account" for the LLC.  (Docket Entry # 121, pp. 4-5).  For example, plaintiff continues, the LLC's articles filed with the California Secretary of State do not reflect the fact that defendant is the sole managing member of the LLC.  (Docket Entry # 121, p. 5).  He maintains that, without "[i]mmediate correction," the articles "will be deemed accurate by the public, as well as governmental agencies, making it appear to all the world that [plaintiff] was a co-manager of the LLC for a period of more than two months." (Docket Entry # 121, pp. 4-5).  According to plaintiff, the "false filings . . . expose[] [plaintiff] to potential LLC member manager liabilities and [the] assumption that he was involved in the management of the LLC's transactions and business during that

_____

[45] This court has included a more detailed summary of Count II as alleged in the amended complaint, including a recitation of the relevant sections of the operating agreement, in the prior discussion section on defendant's motion for summary judgment (Docket Entry # 115).

time when he was never anything other than a passive, non-
managing member." (Docket Entry # 121, pp. 4-5).

Plaintiff also maintains that defendant has failed, contrary
to his obligations under section 6.02(C), "to furnish [plaintiff]
an annual report of the LLC," which would include certain
financial statements, "prepared in accordance with GAAP."
(Docket Entry # 121, p. 6). Finally, he argues that, in
violation of section 6.02(D), defendant did not provide plaintiff
with "copies of tax returns for the LLC for the 2017 tax year"
until October 2021. (Docket Entry # 121, p. 7). According to
plaintiff, defendant has "refused to certify that the returns he
supplied [in October 2021] were actual copies of what he
purported to have filed." (Docket Entry # 121, p. 7).
Curiously, in moving for summary judgment on Count II, plaintiff
does not address defendant's purported violation of section
4.04(a) of the operating agreement, which he alleged in Count II
of the amended complaint.[46]

Defendant argues in response that Count II should be
dismissed because plaintiff failed to satisfy the "condition
precedent" in the operating agreement requiring plaintiff to

---

[46] The amended complaint alleges that defendant breached his
obligation under section 4.04(A) "to contribute to the capital
of the LLC his proportionate share of [] required additional
funds," while plaintiff loaned $134,113.53 to the LLC. (Docket
Entry # 20-1, p. 43-44, ¶¶ 167-68); see (Docket Entry # 119-2,
p. 8, section 4.04(A)).

resolve disputes regarding the LLC's financial statements with a third-party, as opposed to in court.  (Docket Entry # 135, p. 4). Defendant also maintains that plaintiff "has failed to allege a case or controversy, harm, or immediate harm" and that "the financial documents were . . . produced more than once and the tax returns were filed, albeit not in accordance with GAAP and not precisely to [plaintiff]'s liking."  (Docket Entry # 135, p. 4).  Defendant fails to cite in his opposition any caselaw in support of his argument that the operating agreement imposed a condition precedent that bars plaintiff from bringing Count II before this court.  See generally (Docket Entry # 135).

However, because plaintiff fails to even address his claim under section 4.04 of the operating agreement, he has failed to show that he is entitled to summary judgment on Count II.[47]  See Fed. R. Civ. P. 56(a).

C.    Count III: Violation of
      Section 17701.13(d)(7) of RULLCA

Count III alleges that defendant violated section 17701.13(d)(7) and "failed without justification to comply with the requirements of [s]ection 17704.10."  (Docket Entry # 20-1, pp. 45-46).  Under section 17704.10(e), "a limited liability company with 35 or fewer members" must send its members "within

---

[47] Plaintiff also fails to cite any caselaw or statute in his support of his argument that summary judgment on Count II is appropriate.

90 days after the end of each taxable year the information
necessary to complete federal and state income tax or information
returns and . . . a copy of the . . . company's federal, state,
and local income tax or information returns for the year."  Cal.
Corp. Code § 17704.10(e).

In moving for summary judgment on Count III, plaintiff
argues that "[defendant]'s failure to comply with" section
17704.10 "cannot be disputed" because "it was not until October
2021 that [defendant] furnished [plaintiff] with copies of
incomplete tax returns for the LLC for the 2017 tax year only[,]
which he represented he had filed with the Internal Revenue
Service and the California Franchise Tax Board."  (Docket Entry #
121, p. 8).  Plaintiff is correct that this fact is undisputed.
(Docket Entry # 120-1, pp. 12-13, ¶ 41); see (Docket Entry #
136, p. 11, ¶ 41).

Defendant opposes summary judgment on the basis that: (1)
"as with [c]ounts I and II, [plaintiff] has not satisfied a
condition precedent to asserting any of the claims under Count
III"; (2) plaintiff has "not alleged a case or controversy,
including alleging harm or immediate harm"; and (3) "none of the
relief sought in paragraphs 7 through 13 of [plaintiff]'s
[m]otion is relief sought in the [a]mended [c]omplaint."[48]

---

[48] In the paragraphs that defendant references, plaintiff
requests a permanent injunction requiring defendant to, inter

(Docket Entry # 135, p. 5).  For the reasons set forth in the prior discussion section on defendant's motion for summary judgment as to Count II, this court disagrees that plaintiff has insufficiently alleged harm and that he was obligated to resort to the operating agreement's dispute resolution procedure before bringing Count III.  This court therefore proceeds to address only defendant's third argument.

The amended complaint requests, inter alia, a permanent injunction ordering defendant to provide plaintiff: (1) "in accordance with the requirements of [s]ection 17704.10(c) . . ., all information needed by plaintiff to complete his federal and state income tax or information returns, and . . . a copy of the LLC's federal, state and local income tax returns for 2017"; (2) "a true copy of the LLC's information return filed with the Internal Revenue Service for 2017"; and (3) "access to the books and records of the partnership[s]."  (Docket Entry # 20-1, pp. 51-53, 56).  Plaintiff's motion for summary judgment seeks additional injunctive relief.  (Docket Entry # 120, pp. 3-5, ¶¶ 7-13).  While plaintiff requests additional relief not explicitly referenced in the amended complaint, the last request for relief

---

alia: "amend all tax filings he has submitted . . . which represent [plaintiff] to be a resident of . . . California"; prepare, maintain, and furnish to plaintiff certain LLC records; and correct certain filings and records with the California Secretary of State.  (Docket Entry # 120, pp. 3-5, ¶¶ 7-11).

in the amended complaint is that this court "[g]rant such other different and further relief as [this] [c]ourt deems appropriate."  (Docket Entry # 20-1, p. 56).  This court therefore finds that the additional injunctive relief plaintiff seeks in his motion for summary judgment falls within the "other different and further relief" requested in the amended complaint.

In support of his argument that "[i]t is well established that the relief to which a plaintiff may be entitled must be contained in his or her complaint," defendant cites Fed. R. Civ. 8(a)(3)[49] and only one case, which is from the Southern District of Ohio.  See (Docket Entry # 135, p. 5) (citing Davis v. Sun Oil Co., 953 F. Supp. 890, 892 (S.D. Ohio 1996) ("[N]o provision of [the Federal Rules of Civil Procedure] or any case law extant authorizes a person to request a form of relief in a motion for summary judgment, different from that requested in his pleading.")).  He does not cite any caselaw from this district or circuit.  "By failing to cite or discuss controlling law, [defendant] provides no support for his" argument.  See Davis v. Brady, No. CA 04-10386-MLW, 2007 WL 1106140, at *2 (D. Mass. Apr. 9, 2007).  Not only is Sun Oil not binding on this court, but it is also not particularly persuasive.  In Sun Oil, the plaintiffs

---

[49] Under Fed. R. Civ. P. 8(a)(3), "[a] pleading that states a claim for relief must contain . . . a demand for the relief sought, what may include relief in the alternative or different types of relief."  Fed. R. Civ. P. 8(a)(3).

requested restitution in their motion for summary judgment, an entirely new type of relief, despite not seeking such relief in the amended complaint.  See Sun Oil, 953 F. Supp. at 892.  Here, plaintiff initially sought injunctive relief, but does so now on a broader basis.  Plaintiff also, as noted previously, included a broad request for relief in the amended complaint.  However, this court declines to grant summary judgment as to Count III in plaintiff's favor because he fails to demonstrate that he is entitled to the relief he seeks, namely a declaratory judgment and injunctive relief.[50]

First, plaintiff does not address any of the elements necessary to obtain a permanent injunction.  See Reid v. Donelan, 2 F. Supp. 3d 38, 43 (D. Mass. 2014) ("In addition to actual success on the merits, a plaintiff seeking a permanent injunction must establish: (1) irreparable harm; (2) the absence of an adequate remedy at law; (3) a balance of hardship favoring the

---

[50] In the amended complaint, plaintiff also makes a general request that this court award him "the costs of this action, including attorney's fees."  (Docket Entry # 20-1, p. 56, ¶ R). In his motion for summary judgment, he requests "damages and expenses, including attorney's fees, for having to bring this action to obtain [defendant]'s compliance of his obligation under the [] [o]perating [a]greement to maintain true and accurate records . . . ."  (Docket Entry # 120, pp. 5-6).  He does not indicate under what count(s) of the complaint he seeks this relief, but because defendant's alleged breach of the operating agreement does not implicate Count III, this court does not consider at this time plaintiff's request for damages and expenses.

plaintiff; and (4) an absence of detriment to the public interest.") (citing Esso Standard Oil Co. v. Lopez-Freytes, 522 F.3d 136, 148 (1st Cir. 2008)).  "The decision to grant or deny such relief is an act of equitable discretion by the district court . . . ."  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 388 (2006).  Accordingly, because plaintiff fails to satisfy the "four-factor" test applicable to a request for a permanent injunction, this court declines to grant such relief on summary judgment.  See id.; Allstate Ins. Co. v. Fougere, No. CV 16-11652-JGD, 2022 WL 194988, at *8 (D. Mass. Jan. 21, 2022). Moreover, because there remain questions of fact for the jury as to whether, for example, plaintiff suffered irreparable harm, summary judgment is inappropriate.  See Pierce, 741 F.3d at 301; Fed. R. Civ. P. 56(c).

Second, and similarly, plaintiff fails to properly support his request for a declaratory judgment.[51]  He asks that this court "[e]nter judgment under Count III . . . declaring and adjudging defendant to be in violation of his obligations under [s]ection 17704.10 . . . ."  (Docket Entry # 20-1, p. 53, ¶ H) (Docket

---

[51] This "court has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunctions." Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Loc. No. 2322, 651 F.3d 176, 189 (1st Cir. 2011) (internal quotation marks omitted) (quoting Zwickler v. Koota, 389 U.S. 241, 254 (1967)).

Entry # 120, p. 3, ¶ 6).  Thus, in substance, plaintiff seeks a declaratory judgment from this court, although he never uses such terms or references the appropriate statute.  See 28 U.S.C. § 2201 ("[A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.").  "Requests for a declaratory judgment may not be granted unless they arise in a context of a controversy 'ripe' for judicial resolution."  Verizon, 651 F.3d at 188; Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 534 (1st Cir. 1995) ("The Declaratory Judgment Act empowers a federal court to grant declaratory relief in a case of actual controversy." (citation omitted)).  There are "a series of factors to be applied by a court in deciding whether to" grant a declaratory judgment.  S. Bos. Allied War Veterans Council v. City of Bos., 875 F. Supp. 891, 905 (D. Mass. 1995).  "[D]eclaratory relief, both by its very nature and under the plain language of 28 U.S.C. § 2201, is discretionary."  El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 493 (1st Cir. 1992); see Ernst & Young, 45 F.3d at 534 ("[F]ederal courts retain substantial discretion in deciding whether to grant declaratory relief.").  Because plaintiff entirely fails to address why a declaratory judgment would be an appropriate remedy as to Count III, this court in its discretion

declines to grant plaintiff declaratory relief at this time.

<u>CONCLUSION</u>

For the foregoing reasons: (1) defendant's motion for summary judgment (Docket Entry # 115) is **ALLOWED** as to Count I and **DENIED** as to counts II, III, V and VI; and (2) plaintiff's motion for partial summary judgment (Docket Entry # 120) is **DENIED** in its entirety.


      /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge